**UNITED STATES of America**

v.

**James HARRIS, Jr.**

**Crim. No. 75–523.**

United States District Court,
E. D. Pennsylvania.

Dec. 5, 1975.

Robert S. Forster, Jr., Asst. U. S. Atty., Philadelphia, Pa., for plaintiff.

Edward M. Gallagher, Media, Pa., for defendant.

## MEMORANDUM AND ORDER

FOGEL, District Judge.

Defendant, James Harris, Jr., has been indicted and charged with the interstate transportation of a stolen motor vehicle (18 U.S.C. § 2312), and the theft of merchandise traveling in interstate commerce (18 U.S.C. § 659). Presently before us is a three-pronged Motion to Suppress Evidence in which Defendant requests the following relief: (1) the suppression of all testimony which may be adduced at trial as a result of statements made by Defendant at the time of his arrest and subsequent thereto, because of an alleged failure of the interrogating agents of the Federal Bureau of Investigation, (F.B.I.) to inform him of his rights under the decision of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (2) the suppression of evidence arising out of a pretrial identification of

Defendant made by two Burlington Township, New Jersey police officers because the photographs displayed by the F.B.I. agent conducting that operation were allegedly shown in a prejudicial manner; and (3) the suppression of all evidence found to be the fruit of an investigatory stop, subsequent search and detention of the vehicle operated by defendant because of defendant's claim that these acts were illegal and hence fatally permeate any evidence stemming from that episode.

We will deny the motion on all scores. The unique factual setting, however, particularly with respect to the circumstances surrounding the stop, search and detention of the vehicle calls for a statement of our reasons for dismissal.

## I. STATEMENT OF THE PERTINENT AND CONTROLLING FACTS

The controlling facts may be summarized as follows:

On July 3, 1975, Patrolman Clarence Bell of the Burlington Township, New Jersey Police Department was assigned to the midnight to eight A.M. shift; his duties included property checks while cruising in an unmarked police vehicle. At approximately 1:00 A.M. Patrolman Bell departed from the grounds of the Burlington Township High School where he had just concluded such a property check, when he noticed a tractor-trailer traveling on a narrow secondary road called Little Oxmeade Road. Based upon his knowledge and experience [1] Patrolman Bell knew that it was highly unusual for a tractor-trailer to be traversing that road at that time of night, and he therefore decided that further investigation was warranted. Patrolman Bell radioed Sergeant Komerosky of the police force, who was on patrol in a marked police vehicle, and requested that the Sergeant meet him for the purpose of making a stop of the tractor-trailer. Patrolman Bell then proceeded to follow the truck as it turned off Little Oxmeade Road, (the entire length of which is only one quarter of a mile), and progressed onto more heavily traveled thoroughfares. After having followed the truck for a distance of about three miles, Sergeant Komerosky pulled up at the rear of Patrolman Bell's vehicle, and it was agreed that the Sergeant would make the stop while Bell closed in at the rear of the truck. Sergeant Komerosky signalled and stopped the tractor-trailer along a thoroughfare known as the Burlington-Columbus Road.

Defendant was the driver of the truck and a fellow passenger was seated beside him. Patrolman Bell positioned himself behind the vehicle in order to direct and divert traffic; simultaneously Sergeant Komerosky approached the cab of the vehicle. Defendant alighted from the truck, and the Sergeant asked him for his license and registration credentials. Defendant produced these documents and they were determined to be in order. Sergeant Komerosky inquired of Defendant with respect to his destination.[2] Defendant replied that he was looking for an address in Willingboro, New Jersey, a neighboring town. When the Sergeant asked for the specific address, Defendant responded that he did not recall it; Sergeant Komerosky, who had been a professional truck driver prior to his service with the local police force, suggested that Defendant should ascertain the address from the bill of lading which the Sergeant, on the basis of his prior experience, assumed Defendant would have with him as a matter of course. Defendant, then and there attempted to locate the bill of lading, but

---

1. At the suppression hearing, Patrolman Bell testified that he had been a part-time police officer for twenty-two years, and had been with the force on a full time basis for five years. In addition, Patrolman Bell's residence is on Little Oxmeade Road. (N.T. 17–18).

2. Sergeant Komerosky testified that although he was suspicious at this point of possible criminal activity, he also considered the possibility that Defendant may have been lost, and that he could accordingly have been of assistance in directing him. (N.T. 50).

was unable to produce it. This concatenation of events aroused Sergeant Komerosky's suspicions, and he asked Harris to open the rear door of the truck. Defendant complied with that request. Sergeant Komerosky then entered the truck, and examined the parcels of freight which were there located; he ascertained that none of the parcels bore a Willingboro address. Sergeant Komerosky then asked Defendant if he had any other destination, and Harris stated that he also had deliveries for Pomona, New Jersey; again, none of the parcels of freight revealed Pomona as a destination. Defendant was then asked to identify his employer, and he stated to the Sergeant that it was the K & K Transport Company, although he could not remember the name of his immediate supervisor. Sergeant Komerosky then asked Defendant to drive to police headquarters in the vehicle. Patrolman Bell followed in his police car, and when they reached the police station Bell remained there for approximately fifteen minutes before departing to return to duty, and specifically to carry out Sergeant Komerosky's request that he drive the passenger who had been in the tractor-trailer to that person's automobile, which allegedly had broken down some distance away.[3]

Defendant was detained in the station house while Sergeant Komerosky attempted by telephone to verify Defendant's employment with K & K Transport and his authority to have possession of the tractor-trailer. Defendant was in the presence of the Sergeant during this period of time at the station. Sergeant Komerosky tried for approximately three hours to verify Harris' story, but because of the hour of the morning, he was unable to reach anyone at K & K Transport, and he therefore permitted

the Defendant to depart in the tractor-trailer.

At approximately eight o'clock that morning, or about four hours after he had released the Defendant, Sergeant Komerosky again called K & K Transport Company, and was informed that one of the company's trucks was indeed missing. The Sergeant then called the Philadelphia office of the F.B.I. and notified them of the stop and detention of Defendant.

Later that same day, Patrolman Bell and Sergeant Komerosky were contacted by Special Agent Budenz of the F.B.I., and were asked to view a group of photographs for the purpose of attempting to identify the two subjects who had been in the tractor-trailer. The photo display took place at the Burlington police department, in a private room. Patrolman Bell and Sergeant Komerosky sat at either end of a large desk with Special Agent Budenz seated between them. The spread consisted of approximately six photographs, all of which were similar with respect to size, background, and the general features of the subject of each photo, including race. Agent Budenz first showed the stack of photographs to Sergeant Komerosky, and asked him if he could identify the driver of the truck he had stopped the previous night. Komerosky selected a photograph of Defendant and identified him accordingly. Patrolman Bell, who was not able to see the pictorial display while the photographs were being exhibited to Komerosky, was then shown the same group of photographs, and he, too, identified Defendant as the driver of the K & K Transport truck.

Based upon this information, a complaint was filed and a warrant was se-

---

3.  Patrolman Bell testified at the hearing that the passenger, who is a co-defendant in this case, told him at the time of the stop that his car had broken down some distance away and that he had been picked up by Defendant, who was driving the tractor-trailer. The passenger stated that he had no idea where the Defendant was headed. After a short time at the police station, Patrolman Bell drove the passenger back to his automobile, which the passenger at that time was able to start without difficulty. (N.T. 10–11, 27).

cured for Defendant's arrest; his name was then entered in the National Crime Information Computer as a fugitive. On the night of July 23, 1975, Defendant was detained by the Philadelphia Police Department as the result of a routine traffic stop, and the F.B.I. was then informed that Defendant had been apprehended.

Special Agent Grubert formally arrested Defendant at the Philadelphia Police Department Roundhouse; he was handcuffed and placed in an F.B.I. vehicle to be taken to that agency's Philadelphia office. Agent Grubert sat in the back seat with Defendant, and while on the way to the office he advised Defendant of his rights under *Miranda v. Arizona, supra,* by reading the standard form which he also showed to Defendant then and there. Defendant stated that he was unwilling to sign the waiver of rights form, but that he understood his rights and would voluntarily answer questions.

When the vehicle reached the F.B.I. office, Harris was fingerprinted and photographed, and while still in that room Agent Grubert again asked Defendant if he was aware of his rights; he responded in the affirmative. Before the interrogation commenced, two other agents entered to make use of the room, and Defendant was then taken to a regular interview room, where Agent Grubert inquired of Defendant, for a third time, with respect to his understanding of his rights; Defendant once more responded affirmatively. Agent Grubert then proceeded to question Defendant, and an oral statement was obtained.

## II. THE ORAL STATEMENT

Defendant has alleged that he was never advised of his rights either at the time of his arrest, or prior to interrogation under *Miranda v. Arizona, supra,* and that if he was so advised, he did not knowingly and voluntarily waive those rights. He therefore argues that any oral incriminating statement which he made should be suppressed. This contention is not supported by the evidence.

At the hearing on this motion, which was held on October 14, 1975, Special Agent Grubert of the F.B.I. testified without equivocation that after he arrested Defendant and placed him in an F.B.I. vehicle, he advised him of his *Miranda* rights by reading them to him from a form which he simultaneously permitted Defendant to read. Defendant at that time acknowledged that he understood his rights, although he would not sign a waiver of rights form. On two other occasions before interrogation began, Defendant affirmatively declared his awareness of his rights. The testimony of Agent Grubert is unshaken and nothing on the record refutes his statement.

We recognize that the government must establish a clear case when it urges that there has been a voluntary waiver of constitutional rights, *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); moreover, it is also true that when a statement is obtained from a defendant in custody in the absence of counsel, "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel", *Miranda v. Arizona, supra.* Under all of the evidence before us, we agree that the government has met its burden in this matter. We find that Defendant was advised of his *Miranda* rights and that he voluntarily, knowingly, and intelligently waived those rights before any statement was made to the authorities.

## III. THE PHOTOGRAPHIC DISPLAY AND IDENTIFICATION

The second argument advanced by Defendant relates to the procedures followed by Special Agent Budenz in connection with the photographic display at which Patrolman Bell and Sergeant Komerosky identified Harris as the man who had been driving the tractor-trailer they had stopped on the morning of July 3. Defendant contends that his failure to be represented by counsel on that oc-

casion, as well as the allegedly prejudicial nature of the photographic spread, resulted in a denial of both his due process rights under the fourteenth amendment, and his right to counsel under the sixth amendment.

■ This argument is clearly without merit. With respect to the absence of counsel at the display, the law is settled beyond any possible doubt that a defendant has no constitutional right to be represented by counsel at a pretrial photographic identification. *United States ex rel. Reed v. Anderson*, 461 F.2d 739 (3d Cir. 1972).[4] Evidence related to pretrial photographic identification will be excluded only if "the photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The testimony in this case utterly fails to support any charge that the photographic display was conducted in a prejudicial manner. The testimony of Patrolman Bell, Sergeant Komerosky and Agent Budenz at the suppression hearing establishes that Bell and Komerosky were separately shown six photographs each,

all of which were very similar in nature. Only one of the photographs was of defendant; we are satisfied from the record with respect to this issue that neither Agent Budenz's conduct of the proceedings, nor the particular photograph of defendant which was among those exhibited, warrants suppression of the evidence of this photograph, or of the identification process itself.

## IV. THE STOP AND SEARCH OF THE TRACTOR–TRAILER

### A. *The Stop*

The last and most knotted issue goes to the propriety of the stop in the first instance, and the search and detention that thereafter ensued. Defendant contends that the police officers had no reasonable basis for the stop; hence, they argue that it was illegal, and that all of the fruits of this unreasonable stop and search must be suppressed.[5] The Government responds with a two-pronged contention: *First*: the stop was valid under a New Jersey statute, (N.J.S.A. 39:3–29), which permits random inspection stops for purposes of checking the operator's driver's license and the registration of the vehicle;[6] *Second*: all of

---

4. The *Reed* rule applies specifically to suspects who are in custody. The Defendant in this case was not even in custody at the time when the photographic identification was made.

5. The significance of this argument lies in the fact that information supplied by Sergeant Komerosky formed a crucial basis for defendant's arrest. Without the stop there could certainly have been no identification of Defendant by the two police officers by photograph or otherwise; it is clear that the identification was a crucial link in the chain of events which led to the arrest.

6. N.J.S.A. § 39:3–29 states:
    The driver's license, the registration certificate of a motor vehicle and an insurance identification card shall be in the possession of the driver or operator at all times when he is in charge of a motor vehicle on the highways of this State.
    The driver or operator shall exhibit his driver's license, and an insurance identification card, and the holder of a registra-

tion certificate or the operator or driver of a motor vehicle for which a registration certificate has been issued, whether or not the holder, driver or operator is a resident of this State, shall also exhibit the registration certificate, when requested so to do by any motor vehicle inspector, police officer or magistrate, while in the performance of the duties of his office and shall write his name in the presence of the officer, so that the officer may thereby determine the identity of the licensee and at the same time determine the correctness of the registration certificate, as it relates to the registration number and number plates of the motor vehicle for which it was issued; and the correctness of the evidence of a policy of insurance, as it relates to the coverage of the motor vehicle for which it was issued.

In *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973), the Supreme Court of Pennsylvania held that probable cause is required before a police officer may stop a single vehicle pursuant to the Pennsylvania

the circumstances rose to a level of suspicion which justified a brief investigatory stop of the vehicle under fourth amendment standards; the further contention is that given the facts with respect to that stop, the search and subsequent detention also did not violate any constitutional right under that amendment.

■■ The Government's first argument may be disposed of quickly. While the Government takes great pains to defend the constitutionality of the New Jersey statute, and thereby justify the stop, we need not consider that question, because that statute under the circumstances of this action, is not relevant. Admittedly, this was not a stop for the purpose of checking the license and registration of the driver and the vehicle. It was an investigative stop.[7] The testimony adduced from Sergeant Komerosky established that Defendant produced a valid license and registration upon the Sergeant's request. Nothing of a suspicious nature occurred between the time of the stop and the production of the requested papers. The suspicion was raised before the stop, posited, as it was, upon the route the truck followed, one that Officer Bell testified to as being not only unusual in daylight hours, but virtually unprecedented at that hour of the night. (N.T. 5). Therefore, if the stop is to be validated, it cannot be done on the basis of the New Jersey Statute cited, because that statute permits a stop for the purpose of checking license and registration and nothing more. Had defendant failed to produce those papers, or if the documents which were produced were suspicious on their face, we would have a distinctly different factual situation. That statute, however, once the check is satisfactorily made, which we accept as fact in this case, cannot justify the further investigation which the Sergeant pursued. Thus, we reject the Government's first ground. The case with respect to the stop, ensuing search and detention must rise or fall under the criteria which have been established by the decisions interpreting the fourth amendment to the Constitution. Only if the facts fall within conduct permitted under that amendment can the stop, ensuing search and detention be validated.

■ The investigatory stop of a vehicle is a "seizure" within the purview of the fourth amendment. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968); *Carpenter v. Sigler*, 419 F. 2d 169, 171 (8th Cir. 1968); *United States v. Mallides*, 473 F.2d 859, 861 (9th Cir. 1973); if it is to be upheld it must be found to have been "reasonable" under the circumstances in which it was made. The Supreme Court has not defined the standard to be applied to vehicular stops, but in *Terry v. Ohio, supra*, which considered the validity of a policeman stopping, briefly detaining, and interrogating a pedestrian, the Court suggested that the inquiry into the validity of any seizure or search is twofold: *whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place."* 392 U.S. at 20, 88 S.Ct. at 1879 (emphasis supplied). In *Adams v. Williams*, 407 U.S. 143, 92 S.Ct. 1921, 32 L.Ed.2d 612 (1972), the Court further refined its holding in *Terry* when it stated:

---

inspection stop statute, 75 P.S. § 1221. Defendant has advanced the argument that *Swanger* should guide our decision here, but we are not bound to follow Pennsylvania law, for in this case the stop was made by New Jersey police officers within the borders of that state. New Jersey law does not require probable cause for a vehicular stop. *State v. Gray*, 59 N.J. 563, 285 A.2d 1 (1971).

7. An inspection stop generally may be characterized as one made pursuant to a state statute which permits the stopping of motorists for the purpose of checking driver's license and registration. An investigative stop is one made on the basis of the suspicion of a law enforcement official that the occupants of the vehicle are involved in criminal activity.

The Fourth Amendment does not require a policeman who lacks the precise level of information necessary for probable cause to arrest to simply shrug his shoulders and allow a crime to occur or a criminal to escape. On the contrary, *Terry* recognizes that it may be the essence of good police work to adopt an intermediate response. [See id., at 23, 88 S.Ct., at 1881] A brief stop of a suspicious individual, in order to determine his identity or to maintain the status quo momentarily while obtaining more information, may be most reasonable in light of the facts known to the officer at the time.

*Id.* at 145, 92 S.Ct. at 1923.

We are dealing with elusive concepts. A court, in addressing itself to the specifics of the particular case before it, suffers the frustration of one trying to grasp quicksilver with bare hands when it attempts to delineate the factual circumstances, which on the one hand justify a stop by a police officer, and which, on the other hand, invalidate a stop as impermissive under the Fourth Amendment. In *Carpenter v. Sigler*, 419 F.2d 169 (8th Cir. 1969), two Nebraska police officers on patrol in the early morning hours had stopped the defendant's automobile after they had observed it moving slowly through the streets in an area plagued by recent burglaries. The Court held that the totality of all of the facts justified the stop. *United States v. Fallon*, 457 F.2d 15 (10th Cir. 1972) presented a fact pattern in which two New Mexico officers had their suspicions aroused when they observed an expensive car which had recently been painted in a bizarre fashion driven by youths who also had a bizarre look. The stop of the vehicle was found to have been reasonable.[8]

Other cases have presented less persuasive fact situations. In *United States v. Davis*, 459 F.2d 458 (9th Cir. 1972), two Los Angeles police officers had observed the defendant in front of a motel which was a known gathering place for narcotics addicts. Defendant was swaying and having difficulty in staying on his feet. The officers concluded in that case "there was something wrong", and when shortly thereafter they saw defendant in an automobile, they stopped the car and found that defendant was in possession of stolen checks. The court concluded that the *Terry* standard had not been met, and reversed the defendant's conviction.[9]

---

8. *See also United States v. Rollerson*, 491 F.2d 1209 (5th Cir. 1974) (police had received complaint that defendant had threatened another with a gun, and defendant then stopped while in vehicle); *United States v. Walling*, 486 F.2d 229 (9th Cir. 1973) (two vehicles on remote rural road late at night, trunk open, female occupant appeared nervous, area had been used for criminal activity in past); *United States v. Fisch*, 474 F.2d 1071 (9th Cir. 1973) (forest ranger had observed unusual events in area, including circling airplane and slow moving van, and stopped van for investigatory check); *Orricer v. Erickson*, 471 F.2d 1204 (8th Cir. 1973) (police had observed signs of recent burglary during early morning hours, saw two men leaving area, and short time later a patrol car pulled defendant's vehicle over on basis of burglary report and fact that there were few cars out at that time of morning); *Dell v. Louisiana*, 468 F.2d 324 (5th Cir. 1972) (police received report of gas station robbery during early morning hours and patrol car observed defendant's vehicle drive slowly past same gas station, and investigatory stop made); *United States v. Harflinger*, 436 F.2d 928 (8th Cir. 1970), *cert. denied*, 402 U.S. 973, 91 S.Ct. 1660, 29 L.Ed.2d 137 (1971) (citizens observed defendant near propane gas tank, acting suspiciously, and reported incident to police, and defendant's vehicle was stopped when patrol car observed him in it); *Wilson v. Porter*, 361 F.2d 412 (9th Cir. 1966) (policemen became suspicious when, at about three o'clock in the morning, they observed the same car driving in the same direction on the same street twice within twenty-five minutes.)

9. *See also United States v. McDevitt*, 508 F.2d 8 (10th Cir. 1974) (police officer pulled defendant's vehicle over on the basis of no objective facts, but merely to ascertain whether vehicle was carrying goods for hire contrary to state law); *United States v. Ward*, 488 F.2d 162 (9th Cir. 1973) (F.B.I. pulled defendant's vehicle over not because

A consistent rule of law can not be found in this series of cited cases;[10] if there is any rule it is that the decision in each case has been bottomed upon the facts peculiar to it.

Thus, we must rest our decision upon the facts of the case at bar; two points are of unique singular significance: *first*: the stop was made by local police officers who knew that territory well; *second*: the vehicle *was not a private automobile, but a commercial tractor-trailer*.

What, then, is the significance of these factors? *First*: the determination of "reasonableness" under the fourth amendment requires a balancing of the interests of the state with the rights of the individual. In the context of the type of seizure involved in the case at bar, the interest of the state in the investigation and detection of criminal activity must be weighed against the right of the individual to proceed at liberty along the public highways, free from arbitrary interference by state officials. *See Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925). However, while the brief interruption of untrammelled highway movement is of sufficient import to demand the constraints of the fourth amendment, it is nevertheless a relatively limited intrusion upon the liberty of the individual. Measured against this intrusion is the duty of the local police officer to investigate crime. A local police officer, particularly in a small rural township, such as Burlington Township, New Jersey, must be recognized as more

than an enforcer of the laws. He is a symbol of the community; he is aware of its problems and those of its citizens; he relates to community members on an intensely personal level. By experience, he is cognizant of the routine movements within the town, and should be given wider latitude than a federal officer to investigate suspicious deviations from this routine. *See Frye v. United States*, 315 F.2d 491, 494 (9th Cir. 1963).

Even a local police officer, of course, may not make an investigatory stop which is irrational, one based purely on his intuitive feel without more. The legality of each stop must be determined by an objective analysis of the facts, and the test must be one that is not based upon visceral reactions and feelings. Police officers of local jurisdiction however, must have sufficient freedom of action legitimately to pursue an investigation when facts known to them present a sound basis to conclude that criminal activity has taken place, is occurring, or imminently will occur. In this regard, local police officers should not be expected to ignore the lessons that experience has taught them, and if a situation is presented to an officer which is both highly abnormal and creates a reasonable inference of criminal activity, the officer then does have a sound basis upon which to justify an investigatory stop of a vehicle and a limited detention of its occupants.

The *second* telling factor in the case at bar is the nature of the vehicle which was stopped. The foundation upon which the fourth amendment is

they suspected him of a crime, but because they believed he possessed information regarding a federal fugitive); *United States v. Mallides*, 473 F.2d 859 (9th Cir. 1973) (officers observed six Mexican-Americans riding in a Chrysler Imperial at dusk, all sitting very erect, and none turned to look at passing patrol car); *United States v. Carter*, 369 F.Supp. 26 (E.D.Mo.1974) (during early morning hours when there were few cars in the area, a St. Louis policeman was passed by an automobile which contained two youths who appeared nervous and upset at the presence of a policeman.)

10. The Ninth Circuit has established the rule that a "founded suspicion" is necessary before a police officer may stop a vehicle for investigatory purposes. *United States v. Larios-Montes*, 500 F.2d 941 (9th Cir. 1974), *cert. denied*, 422 U.S. 1057, 95 S.Ct. 2681, 45 L.Ed.2d 709 (1975); *Wilson v. Porter*, 361 F.2d 412 (9th Cir. 1966).

based is the right of the individual to privacy free from unreasonable state intrusion. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). As noted, the "reasonableness" standard requires a balancing of interests, and there are thus relative "zones of privacy" within which the individual is protected from varying degrees of state intrusion. *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). The occupants of a motor vehicle clearly are within the scope of fourth amendment protection, for in such situations there is a reasonable expectation of privacy. *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Carpenter v. Sigler, supra.* The Supreme Court has recognized, however, that an individual's privacy interest in an automobile is less compelling than in a home. The Court in *Preston v. United States*, 376 U.S. 364, 366, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964) stated:

> Common sense dictates, of course, that questions involving searches of motorcars or other things readily moved cannot be treated as identical to questions arising out of searches of fixed structures like houses. For this reason, what may be an unreasonable search of a house may be reasonable in the case of a motorcar.

We likewise believe that what may be an unreasonable seizure of the occupants of an automobile may be reasonable in the case of the occupants of a commercial tractor-trailer, particularly when that vehicle is traveling on a road and at an hour when that particular thoroughfare does not experience such traffic. The private owner of an automobile rightly may consider it his private and personal domain. The driver of a commercial vehicle owned by another generally does not have this degree of freedom. Thus, we believe that the stopping of the truck under all of the facts before us, involves a lesser degree of intrusion than would occur if a privately owned automobile, operated by the owner, or one driving with his consent, had been stopped. We do not suggest that an officer may arbitrarily make an investigatory stop of any commercial vehicle, nor do we say there is carte blanche when a tractor-trailer is involved. We believe that the totality of all of the factors, including the nature and place of the vehicle, merits consideration in any determination which goes to the issue of whether or not these officers had a sound basis upon which to justify an investigatory stop of the Defendant's vehicle.

We believe that the record before us supports the legality of the stop. Patrolman Bell, a police officer of twenty-seven years' experience, observed a large tractor-trailer on a small rural road in the early hours of the morning. As noted, Patrolman Bell knew, both in his capacity as a police officer, and as a fifteen year resident on that very same small rural road, that it was highly unusual to see a tractor-trailer rumbling down it at any time, let alone at one o'clock in the morning. We agree that Patrolman Bell could reasonably infer the existence of criminal activity from these unique facts, and we therefore find that he had a sound basis to justify a call for assistance for the purpose of making an investigatory stop of the truck. The seizure was therefore reasonable under the dictates of the fourth amendment.

Having determined that the officers' actions were justified at their inception, we must next consider whether they were "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio, supra.* Sergeant Komerosky, after he had stopped the truck, asked the Defendant for his license and registration, and Defendant was able to produce these items. We think that Sergeant Komerosky was justified in further pursuing his questioning by inquiring of the Defendant as to his destination. The truck was stopped because it was observed in an unusual location, and we think that

destination was a relevant and reasonable inquiry under the circumstances.

### B. *The Search and Detention*

■■■■■ With respect to the search by Sergeant Komerosky of the contents in the trailer of the truck, the facts show that Defendant could not specify his destination; moreover, he could not produce upon request any bill of lading for the goods in the vehicle. No search of the vehicle could legally be conducted absent probable cause. *Almeida-Sanchez v. United States*, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). While it is clear that Sergeant Komerosky did not have probable cause to make a search of the truck at the time that the stop was made, Defendant's responses to the officer's questions were sufficiently suspicious to provide probable cause to believe that the truck was carrying contraband. It was certainly reasonable for Sergeant Komerosky to infer that the failure to possess a bill of lading was a strong indication that the truck and its contents might be stolen. This is highlighted by the fact that the Sergeant had been a driver of commercial vehicles of this nature before he became a permanent member of the police force. (N.T. 34)

Of course, even with probable cause a warrant must ordinarily be obtained before a search may be conducted. The Government, however, relies on the "exigent circumstances" exception to the warrant requirement announced in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925) and refined in *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) and *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). "This exception to the warrant requirement, authorized for certain automobile searches, is premised on the theory that the mobility of the automobile presents a danger that contraband will move or disappear." *United States v. Valen*, 479 F.2d 467, 470 (3d Cir. 1973). But as stated in Valen:

> The "exigent circumstances" exception is not a per se rule to be applied indiscriminately to every automobile containing contraband, nor should it be applied to every object that has the capacity for movement. Rather, its application should depend upon an evaluation of attendant circumstances. At the very minimum there must be probable cause to make a search for contraband. *Id.*

The facts before us meet this standard. At that time of night in a rural area, obtaining a warrant promptly would have been highly unlikely, and if the Defendant had been allowed to depart in the truck, there was certainly little chance that any contraband or stolen articles contained in the truck would remain there for seizure pursuant to a warrant. We therefore find that there existed both the requisite probable cause and exigent circumstances to justify the search of the truck by Sergeant Komerosky.

■■■■ Finally, when Sergeant Komerosky determined from his search that none of the freight in the tractor-trailer was marked for the towns to which Defendant stated he was heading, the officer clearly had a proper basis upon which to adopt the intermediate response of limited detention at police headquarters. The truck had not been reported stolen, and it was reasonable for him to pursue his investigation by telephone in order to determine whether his suspicion that the truck was stolen was accurate. When he was unable to make telephone connection because of the hour, he permitted Defendant to leave the station and to pursue his course without interference.

### V. CONCLUSION

Thus, we conclude that on all scores Defendant's motion must be denied and an appropriate Order will be entered.