UNITED STATES, Appellee,

v.

Charles R. HARRIS, Private U.S. Marine Corps.

No. 33,726.
NCM 76–1798.

U. S. Court of Military Appeals.

May 8, 1978.

The United States Navy Court of Military Review affirmed the findings and sentence. *United States v. Harris*, NCM 76–1798 (N.C. M.R., November 11, 1976). We granted review to consider the appellant's claim that the trial judge committed error when he admitted as evidence a quantity of marihuana seized from the appellant following the stop of an automobile which was entering the main gate at the Marine base, Twentynine Palms, California. We have determined that the procedures utilized by the authorities which led to the discovery and seizure of the marihuana rendered it inadmissible. Accordingly, we reverse.

I

On February 29, 1976, the vehicle in which appellant and five other Marines were riding sought to enter the main gate at Marine Base, Twentynine Palms, California. Sergeant Paschall, a military policeman who was searching incoming vehicles, asked the driver whose name was Ayers to pull off the road at a predesignated spot and have everyone alight from the car. Ayers did as requested, and as the passengers were also exiting the vehicle, the appellant dropped two bags which a subsequent laboratory analysis showed contained marihuana.[1]

At trial, the prosecutor only presented Sergeant Paschall, who testified about the circumstances under which the two bags were found. He testified on direct examination concerning the procedure which he utilized to conduct the gate search. This testimony included a discussion of the number of vehicles stopped; how *he* selected the vehicles to be searched; and a number of questions relating to whether this selection of the vehicles was actually random. Later, he was asked to describe *his* procedure for random searches. In doing so, he averred that when his dog is ready to work, he takes the vehicle which enters the gate at that time. Thereafter, he might give the dog a break if she is fatigued and then

*Lieutenant Robert R. Sparks, Jr.*, JAGC, USNR, argued the cause for Appellant, Accused. With him on the brief were *Captain Albert W. Eoff, II*, JAGC, USN, and *Lieutenant Lawrence W. Muschamp*, JAGC, USNR.

*Captain Christopher M. Klein*, USMC, argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel P. N. Kress*, USMC, and *Lieutenant Commander N. P. DeCarlo*, JAGC, USN.

Opinion of the Court

PERRY, Judge:

The appellant was convicted by special court-martial of possession of marihuana in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. He was sentenced to a bad-conduct discharge and confinement at hard labor for 2 months.

---

1. Available to assist Sergeant Paschall in this operation were two narcotics detection dogs, but, they were not utilized in this case. He was the senior handler for these dogs. Corporal Davenport, another dog handler, was also present.

repeat the process. Then he pointed out that the dog may lose her motivation for a time so they play with her until she is ready again. The dog needs a break from time to time because she is playing a game for a reward, which is usually a ball. But, if she gets tired of the ball or it becomes bothersome (meaning if she is working rather than playing), then the handler will play with her to get her remotivated.

The only defense witness was Corporal Davenport, who testified as to Sergeant Paschall's method of selecting the vehicles to be stopped. He stated that his own method was to stop every fourth car.

Defense counsel then objected to admission of the two bags of marihuana found at the gate on February 29, 1976, on the ground that the selection of automobiles to be searched was not random and therefore the process of obtaining the evidence was illegal. Trial counsel argued, however, that the legality of the procedure was based on the authority of the Commanding General[2] to conduct random searches of vehicles "aboard the base."

Pursuant to a question from the trial bench, defense counsel agreed that the commander could "determine a narcotics offender profile, and then order his sentries to select from that profile, randomly, automobiles to be" stopped for search. At the same time, defense counsel insisted "that there . . . must be definitive standards, something other than at the total discretion of an NCO who's out there conducting a search." Finally, the military judge ruled that the evidence was admissible.

In his post-trial review, the staff judge advocate to the supervisory authority concluded as his initial basis for sustaining the trial court's ruling that since the appellant was only a passenger in a vehicle which was owned by another Marine, he had no stand-ing to object to any search of that vehicle. Secondly, and more importantly, he concluded that the two bags of marihuana were not obtained as a result of any search. Rather, they were observed in plain view in a place where the appellant had no reasonable expectation of privacy. For reasons to be stated, however, we reject the staff judge advocate's analysis of the appellant's objection.

II

■ Admissibility of evidence obtained in a search procedure is subject to challenge only if one meets the standards for establishing standing. *Jones v. United States,* 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960). While "[t]he law of standing under the Fourth Amendment has followed a tortuous path," *United States v. Galante,* 547 F.2d 733, 736 (2d Cir. 1976), there are now some settled principles which should be enucleated. *See* Manual for Courts-Martial, United States, 1969 (Revised edition), paragraph 152, p. 27–62. It is not enough to establish standing that evidence obtained by an illegal search will be used against the accused. *United States v. Holmes,* 521 F.2d 859, 867 (5th Cir. 1975). But one who "has a reasonable expectation of privacy that is violated by the intrusion" has standing. *United States v. Nunn,* 525 F.2d 958, 959 (5th Cir. 1976).

■ Standing may be shown from legitimate presence at the scene of the search; ownership of, or possessory interest in, the place or thing searched; or being charged with an offense having possession of the seized item at the time of the search as an essential element. *See e. g., Mancusi v. DeForte,* 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); *United States v. Pretzinger,* 542 F.2d 517, 520 (9th Cir. 1976); *United States v. Alewelt,* 532 F.2d 1165, 1167 (7th Cir. 1976); *United States v. Lang,*

---

2. Marine Corps Base, Twentynine Palms, Base Order P1630.6, paragraph 200.7 provides:

Authority is hereby delegated to the Provost Marshal to conduct random inspections of any vehicle seeking to enter or leave Marine Corps Base, Twentynine Palms, to pre-vent the removal or introduction of contraband or the illegal entry or departure of persons. Mass searches or inspections will be accomplished only when approved by the Commanding General, Assistant Commander or Chief of Staff, Marine Corps Base.

527 F.2d 1264, 1266 (4th Cir. 1975); *Brown v. United States,* 411 U.S. 223, 229, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973).

Where possession of the challenged items is an essential element of the offense, standing is "automatic." Otherwise, *"actual* standing" may be shown by presence at the scene of the search or by claiming "a proprietary interest in the premises searched or a possessory interest in the articles seized." *Brown v. United States, supra* at 229, 93 S.Ct. at 1569. But when an accused does claim such an interest, the testimony given by him in order to establish his "standing" to object to the reputed illegally seized evidence may not be used against him at his trial on the question of guilt or innocence. *Simmons v. United States,* 390 U.S. 377, 394, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). Such a "showing in support of actual standing" is an absolute prerequisite, "and is not to be assumed." Neither the "verdict nor governmental contention" may provide actual standing which has not been otherwise established when the objection is made. The requirement of standing applies separately to each offense, so there would be no automatic standing as to a charge of conspiracy to possess drugs, but there would be automatic standing to a corresponding possession charge. *United States v. Prueitt,* 540 F.2d 995, 1004–5 (9th Cir. 1976); *United States v. Galante, supra* at 738. Acquittal of a possession charge divests one of any automatic standing (as to other offenses) which may have existed before the acquittal. *United States v. Boston,* 510 F.2d 35, 37 (9th Cir. 1974), *cert. denied,* 421 U.S. 990, 95 S.Ct. 1994, 44 L.Ed.2d 480 (1975); *United States v. Prueitt, supra* at 1004.

Moreover, there may be standing to contest a seizure but not the antecedent search, or vice versa. *United States v. Galante, supra* at 737 (n. 5), 739 (n. 11). In *Galante,*

there was an "illegal" search of a store followed two days later by seizure of the property found during the search. On the other hand, the seizure and search may be so "bound together by one sole purpose—to locate and seize the narcotics of respondent," that the seizure and search are "incapable of being untied." As such, they must be treated as one act, and standing for one automatically applies to the other. *United States v. Jeffers,* 342 U.S. 48, 52, 72 S.Ct. 93, 95, 96 L.Ed. 59 (1951).

Applying these principles to the case at bar, it is clear that Harris has standing to challenge the stop of the vehicle driven by Ayers in which he was a passenger. The Fourth Amendment came into play when the car was stopped.[3] As the action in disposing of the plastic bags which contained the contraband was the direct result of the stop, *Jeffers* teaches that standing as to part of the process confers standing on the whole. The allegation of possession conferred "automatic" standing upon appellant to challenge the applicable stop and its product.

### III

We proceed now to a general consideration of the validity of searches at the entry points to a military installation. There are two relatively recent decisions by this Court and a Court of Military Review decision which have upheld their validity. The applicability and continued vitality of those decisions must now be evaluated.

*United States v. Poundstone,* 22 U.S.C. M.A. 277, 46 C.M.R. 277 (1973), is not controlling because (1) the search occurred in wartime in a war zone;[4] (2) the vehicle which was stopped was a government vehicle; (3) the person who ordered the stop was not a law enforcement official and was acting under instructions " 'to search every vehicles (sic) of the battalion' " and to

---

**3.** *United States v. Martinez-Fuerte,* 428 U.S. 543, 556, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976); *United States v. Nunn,* 525 F.2d 958, 959 (5th Cir. 1976); *United States v. Mallides,* 473 F.2d 859, 861 (9th Cir. 1973); *United States v. Harris,* 404 F.Supp. 1116, 1123 (E.D.Pa.1975).

**4.** What may be reasonable in a war zone may be unreasonable in "the peaceful geographical limits of the United States." *United States v. Poundstone,* 22 U.S.C.M.A. 277, 279, 46 C.M.R. 277, 279 (1973).

" 'search all of the individuals on' " any vehicle he searched, *id.* at 279, 46 C.M.R. at 279; (4) the accused was a passenger in a government vehicle [*cf. United States v. Di Re,* 332 U.S. 581, 587, 68 S.Ct. 222, 92 L.Ed. 210 (1948)]; and (5) the accused was not a member of the command which controlled the vehicle on the post.

*United States v. Unrue,* 22 U.S.C.M.A. 466, 47 C.M.R. 556 (1973), is also factually distinguishable from this case because (1) all vehicles were subjected to the dual checkpoint system; (2) the dog did not enter the vehicle where the occupants remained unless the dog alerted; (3) the deterrence aspects of the system were emphasized by the availability of an "amnesty" barrel; (4) the procedure was standardized according to the commander's instructions; (5) part of the process was a driver's license and vehicle registration check; and (6) the procedure was utilized during a time of war. [See footnote 4 supra.] *United States v. Blade,* 49 C.M.R. 646 (A.F.C.M.R. 1974), *pet. denied,* 23 U.S.C.M.A. 663 (1975), upheld a gate search ordered in compliance with a Strategic Air Command directive "that installation commanders direct a 'no-notice search of all (100 percent) incoming and departing vehicle traffic at least once monthly.' " The only decision left for the local commander was the timing and duration of the operation. According to local procedures, there was an inspection of driver's license and registration as well as an examination "of the interior of the car, the glove compartment, and the trunk." No dogs were utilized in these searches. Hence, the search procedure employed in

*Blade* is also factually distinguishable from the instant case.

## IV

It is thus clear that prior decisions do not provide definitive answers to the question presented here. Accordingly, we proceed to evaluate the applicability of the prevailing general concepts developed under the Fourth Amendment to the Constitution.

The stop of the vehicle at the gate for the purpose of conducting a search involves a seizure, [See footnote 3 supra.] and is therefore subject to the provisions of the Fourth Amendment.[5] This amendment is basically designed "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *see also United States v. Ortiz,* 422 U.S. 891, 895, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975). This purpose is effectuated by the constitutional rule "that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment— subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967).

That there was no probable cause to stop the car at the gate is undeniable, so seizure cannot even be justified pursuant to any of the traditional exceptions[6] to the general rule requiring warrants based on probable cause, unless there was consent.[7] Neither the bona fide emergency doctrine[8] nor the "open field" exception[9] applies here.

---

5. The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized."

6. *Incident to arrest: Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Whiteley v. Warden, Wyoming State Penitentiary,* 401 U.S. 560, 568–9, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971); *Hot pursuit: Warden v. Hayden,* 387 U.S. 294, 299, 87 S.Ct. 1642, 18

L.Ed.2d 782 (1967); *Automobiles: Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Almeida-Sanchez v. United States,* 413 U.S. 266, 269–70, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973); *United States v. Burrow,* 396 F.Supp. 890, 903–907 (D.C.Md. 1975); *United States v. Harris, supra* at 1127.

7. *See Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

8. *United States v. Smeal,* 23 U.S.C.M.A. 347, 49 C.M.R. 751 (1975).

9. *Hester v. United States,* 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1925).

It is well settled that the government has the burden of proving free and voluntary consent in order to justify a search upon that basis.[10] There must be proof "that the consent [was not] coerced, by explicit or implicit means, by implied threat or covert force."[11] Mere acquiescence is not consent,[12] and consent may be limited or withdrawn by the express declaration of the person consenting.[13]

Although there was nothing in the instant case even approaching explicit consent, the existence of implied consent may be enough to justify stopping the vehicle in which the appellant was riding. A potential question, therefore, is whether the driver of a vehicle impliedly consented to a stop of his vehicle at the gate as a condition for entry into the base. However, we need not consider that question in view of our holding that appellant has standing to challenge the procedure employed here since that decision is based upon its effect upon his own rights. The real question, then, is whether appellant has in any way impliedly consented to be stopped for a search at the gate. We believe that disposition of this question requires an examination of those cases dealing with administrative searches in which the implied consent doctrine was considered.

### A

*Colonnade Catering Corp. v. United States,* 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970), held that entry by federal agents (without a warrant but pursuant to statutory authority) into a locked storeroom in a catering establishment to search for liquor which they suspected was being kept in violation of the federal excise tax law was valid in view of "the historically broad authority of the Government to regulate the liquor industry." However, since Congress did not sanction "forcible, warrantless entries," the forcible entry by the agents in *Colonnade* was held illegal. Therefore, Colonnade Catering Corporation prevailed in its suit to recover the seized liquor and to suppress it as evidence.

Two years later *United States v. Biswell,* 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972), upheld a warrantless inspection pursuant to statutory authority of a gun storeroom in a pawn shop operated by one who was federally licensed to deal in sporting weapons. Two unlicensed sawed-off rifles were seized and Biswell was convicted for violation of the statute requiring payment of a special occupational tax. 26 U.S.C. § 5801. Mr. Justice White stated: ". . . In the context of a regulatory inspection system of business premises that is carefully limited in time, place, and scope, the legality of the search depends not on consent but on the authority of a valid statute." 406 U.S. at 315, 92 S.Ct. at 1596. He further stated: ". . . Here, if inspection is to be effective and serve as a credible deterrent, unannounced, even frequent, inspections are essential. In this context, the prerequisite of a warrant could easily frustrate inspection; and if the necessary flexibility as to time, scope, and frequency is to be preserved, the protections afforded by a warrant would be negligible." *Id.* at 316, 92 S.Ct. at 1596. Finally, the "inspections . . . pose only limited threats to the dealer's justifiable expectations of privacy" because the dealer engages in the business of selling firearms with full knowledge that he is subject to inspection. *Id.* Therefore, the seizure of the rifles in the inspection was valid, and the rifles were properly admitted in evidence.

Both *Colonnade* and *Biswell* were described in *Almeida-Sanchez v. United States,* 413

---

10. Supra, 412 U.S. at 222, 93 S.Ct. 2041.

11. *Id.* at 228, 93 S.Ct. at 2048.

12. *Bumper v. North Carolina,* 391 U.S. 543, 548–550, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968);

*Cf. United States v. Chase,* 1 M.J. 275 (C.M.A. 1976).

13. *United States v. Castro,* 23 U.S.C.M.A. 166, 48 C.M.R. 782 (1974).

U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973), as recognizing

> that businessmen engaged in such federally licensed and regulated enterprises accept the burdens as well as the benefits of their trade, . . . The businessman in a regulated industry in effect consents to the restrictions placed upon him. *Id.* at 271, 93 S.Ct. at 2538.

While both *Colonnade* and *Biswell* laid significant emphasis on implied consent, it must be remembered that such implication was permitted because the liquor and the firearms businesses are "federally licensed and regulated enterprises" pursuant to statutory authority. The long history of regulation at least of liquor gave notice of the conditions under which a federal license could be granted. However, absent (a) statutory authority, (b) the right to condition practice of the trade upon acceptance of a license, and (c) the limited nature of the expectation of privacy extant in a regulated enterprise, it is doubtful that those two decisions would have viewed the overall inspection program in the same light. We will discuss each of these prerequisites in another part of the opinion and will then consider their effect upon the instant case. *See* pages 61–62, 63–64 *infra.* In light of that discussion we conclude that neither *Colonnade* nor *Biswell* controls here, especially since those cases concern business enterprises rather than personal activities, and since, in both cases, "the searching officers knew with certainty that the premises searched were in fact utilized for the sale of liquor or guns." 413 U.S. at 271, 93 S.Ct. at 2539. We further note in connection with (a) above, that *Berger v. New York,* 388 U.S. 41, 87 S.Ct. 1873, 18 L.Ed.2d 1040 (1967), reminded us that even the existence of a statute was not necessarily enough to permit the intrusion involved there.

While consent has also been mentioned in connection with administrative searches and airport searches, it has not been the primary basis for upholding those activities. In *Wyman v. James,* 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971), the question was "whether a beneficiary of the program for Aid to Families with Dependent Children (AFDC) may refuse a home visit by the caseworker without risking the termination of benefits." *Id.* at 310, 91 S.Ct. at 382. New York statutes and regulations required such visits as a condition for continuation of benefits. The purpose of those visits was to check for changed conditions affecting eligibility for assistance or the amount thereof, and/or the need for other kinds of assistance.

At the outset Mr. Justice Blackmun emphasized that no force or compulsion was involved in the visit and refusal to permit a visit does not bring criminal sanctions. Withholding of consent for the visit only results either in denial or cessation of aid. Absent consent, the home is not entered and there is no search.

On the other hand, even assuming the visit to be a search ("perhaps because the average beneficiary might feel she is in no position to refuse consent to the visit"), it is reasonable and therefore valid. Eleven reasons for this conclusion were set forth. *Id.* at 318–324, 91 S.Ct. 381. Basically they center around the fact that protection of the dependent child, which is the aim of the program, is in the public interest; the public has the right to supervise use of its tax money; the procedures give advance warning; emphasis on privacy and reasonable hours insures a minimum burden on the family; refusal does not result in prosecution; the visit is not by the police, is not to get information about a crime, and is not in aid of a criminal proceeding or investigation.

*Wyman* involved significantly different considerations from the instant case, particularly the fact that the purpose of the visit had nothing to do with criminal activity, and, therefore, does not control. *See infra* Section D, page 55.

### B

Implied consent has been mentioned as a basis for opening hand-carried luggage or frisking a passenger who has activated a magnetometer during the airport screening procedures now in operation in all airports

to counteract the threat of aircraft hijacking. The procedure involves each passenger walking through a metal-detecting device called a magnetometer.[14] Before passing through the device the prospective passenger presents his hand-carried luggage for manual or machine inspection. Manual inspection is accomplished by physically examining the contents of the luggage. If the machine does not activate and the luggage passes inspection, the passenger proceeds to board his flight. Otherwise he is subjected to a "follow-up investigation." *United States v. Albarado,* 495 F.2d 799, 802–3 (2nd Cir. 1974).

*United States v. Davis,* 482 F.2d 893 (9th Cir. 1973), dealt with a search of carry-on luggage of a prospective airline passenger by an airline employee. A loaded revolver was found and Davis was prosecuted for attempting to board an aircraft while carrying a concealed weapon, in violation of 49 U.S.C. § 1472(*l*). Davis' motion to suppress the weapon was denied. The Court stated that the applicable standard for determining the validity of this kind of operation was "the Fourth Amendment's standard of reasonableness." Because there exists " 'no ready test for determining reasonableness,' " it must be evaluated " 'by balancing the need to search against the invasion which the search entails.' " *Id.* at 910. After recognizing that the threat of "airline hijacking is unquestionably grave and urgent"; that the possibility of "damage to person and property from such acts is enormous"; that air traffic is severely disrupted; and that the risk of complicating our foreign relations "is serious," *id.,* the Court of Appeals concluded:

> To meet the test of reasonableness, an administrative screening search must be as limited in its intrusiveness as is consistent with satisfaction of the administrative need that justifies it. It follows that airport screening searches are valid only if they recognize the right of a person to avoid search by electing not to board the aircraft. *Id.* at 910–11.

By passing through the search procedure, the passenger may have made a "choice, whether viewed as a relinquishment of an option to leave or an election to submit to the search, [which] is essentially a 'consent,' granting the government a license to do what it would otherwise be barred from doing by the Fourth Amendment.' " *Id.* at 913. Still, the Government has the burden of proving that there was either express or implied consent-in-fact, in accordance with the test set forth in *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). This could be done as follows, said the Ninth Circuit:

> It may be that signs, pre-boarding announcements, screening operations underway at nearby gates, or other circumstances justified an inference that appellant was alerted to the procedures being employed and, by his attempt to board, manifested his willingness to submit to the search of his briefcase. . . . 482 F.2d at 914.

Significantly, the *Davis* court relied upon implied consent as the sole rationale for upholding airport searches, even though it analogized those searches to the "administrative searches" [15] previously discussed in the *Biswell* and *Wyman* cases. Thus, it was not enough that the Court concluded that these "searches [were] conducted as part of a general regulatory scheme in furtherance of an administrative purpose, rather than as part of a criminal investigation to secure evidence of crime." *Id.* at 908. This conclusion was based on the fact that the airport search program was designed "to deter persons carrying [weapons or explosives] from seeking to board at all." *Id.* The Court decided that this purpose would be best realized by giving the prospective passenger the option not to fly, since no matter when he decides to fly, he will be subject to the search and procedures. However, for reasons stated in Section (3) *infra,* pages 59–60, we conclude that appellant [Harris] had no such option.

---

**14.** *See United States v. Doran,* 482 F.2d 929, 930 (9th Cir. 1973).

**15.** However, the Court "placed no analytical significance on this label." *United States v. Albarado, supra* at 804 (fn. 9).

The Second Circuit in *United States v. Albarado, supra,* took a slightly different approach to the validity of the frisk of the passenger who activates the magnetometer. Rather than rely on consent, that circuit applied the test of "the reasonableness of the total circumstances." 495 F.2d at 808. A significant factor was the lesser degree of attached stigma because many people were subjected to search, which "does mitigate the invasion" of privacy. *Id.* at 807. But most important of all, the Court declared:

> The intrusiveness of the airport frisk is also limited by foreknowledge of it. Signs warn of searches and one standing in line may see those in front being frisked. Thus, when one is himself frisked, it is not a surprise, and there is an element of voluntariness. Even after activating the magnetometer, the prospective passenger may refuse to submit to a frisk and instead forfeit his ability to travel by air, because this serves the purpose of the whole search procedure, which is not to catch criminals, but rather to keep armed hijackers from getting on airplanes. . . . The signs and highly visible magnetometers and frisks serve as a deterrent, and indeed the hope is that the prospective hijacker *will* turn around and leave. Thus, while there is coercion to submit to the airport frisk, there is no compulsion, as there is in an ordinary street frisk, and the airport frisk is, . . less intrusive thereby. *Id.* at 807–8.

Hence, while "an explicit warning that the person may avoid the frisk by not flying" would have been useful, the Second Circuit nonetheless countenanced airport searches based on "the *fact* that a passenger may withdraw at any time [*cf.* pp. 59–60, Section (3) *infra*] plus the general knowledge that one is subject to a search if one flies," and that the invasion of the passenger's privacy is otherwise minimum. *Id.* at 808.

However, this only meant that the basic concept was approved. Although, further investigation was obviously in order, the method of an immediate frisk after activating the magnetometer was subjected to this "basic test: . . . what is the minimal invasion of privacy consistent with the need for further investigation? . . . [T]he rule is easy to state: exhaust the other efficient and available means, if any, by which to discover the location and identity of the metal activating the magnetometer before utilizing the frisk." Since "activating the magnetometer is not a general license to search for anything," *id.,* the Court held that the failure to ask the person to empty his pockets, go through the device again, and frisk only if it activated this second time meant "that the search of appellant was not as limited in its obtrusiveness as it might have been." *Id.* at 809. This was in keeping with the "*constitutional requirement that to be reasonable the search must be as limited as possible commensurate with the performance of its functions.*" *Id.* at 806.

In determining the validity of using the magnetometer as the initial phase of the airport search process, the Second Circuit rejected consent as a basis, since the choice between flying or not submitting to the search was at least a "subtle" form of coercion. Also forcing passengers to find another kind of transportation "would work a considerable hardship on many air travelers," *id.* at 807, if there were any alternatives at all. Therefore, the following balancing process was employed:

Because the magnetometer is activated by about every other person who passes through it, but weapons are only found on about one percent of those people, it is deemed to be "inefficient." On the other hand, there is an "absolutely minimal invasion of privacy." The person is not detained in any way.[16] Nor does he suffer any indignity, annoyance, fright or humiliation by passing through it. There is no cause for concern when the machine is activated, "because such a large number of persons may activate it in so many ways." And signs provide warnings of the "magnetometer search," so there is nothing surrep-

---

16. *Cf. Davis v. Mississippi,* 394 U.S. 721, 89 S.Ct. 1394, 22 L.Ed.2d 676 (1969).

titious about it. These factors led to this conclusion:

> Upon this balance . . . the use of a magnetometer is a reasonable search despite the small number of weapons detected in the course of a large number of searches. The absolutely minimal invasion in all respects of a passenger's privacy weighed against the great threat to hundreds of persons if the hijacker is able to proceed to the plane undetected is determinative of the reasonableness of the search. *Id.* at 806.

### C

There are also statutes which permit "random inspection stops for purposes of checking the operator's driver's license and the registration of the vehicle." *United States v. Harris*, 404 F.Supp. 1116, 1122 (D.C.E.D.Pa.1975). *See* our discussion, *infra*, page 56 (n. 20). Implied consent was rejected as a basis for such a stop in *Commonwealth v. Swanger*, 453 Pa. 107, 307 A.2d 875 (1973), which held that probable cause to believe a vehicle or the driver is in violation of the Motor Vehicle Code was required before "a single vehicle" may be stopped for inspection. However, that decision explicitly did not apply "to systematic stops or roadblocks for detection of Motor Vehicle Code violations . . . "[17] *Id.* at 877 (n. 3).

The Court reached its conclusion after balancing the interests and concluded that "specific facts justifying this intrusion" would be required in order to avoid giving "the police absolute, unreviewable discretion and authority to intrude into an individual's life for no cause whatsoever." *Id.* at 878. Such "complete discretion to stop any automobile . . . could be used arbitrarily, or as a guise for seeking evidence of other crimes, or on mere 'fishing expeditions.'" *Id.* at 879. This case portends the significance of the scope of discretion in the instant case. (*See* our discussion, *infra*, pages 56, 58–59).

### D

Aside from *Colonnade* and *Biswell*, cases considered thus far have engaged in a balancing process of one form or another. Even *Davis* falls into this category, although it found the factor of consent dispositive under the circumstances. *Albarado* emphasized the "absolutely minimal invasion of privacy" (*see* our discussion in Section D, page 58) involved in use of the magnetometer but insisted upon a procedure utilizing a graduated response to activation of that device. Significantly, it entirely rejected consent as a rationale for the process. In light of the discussion in footnote 20, *infra*, as well as the showing on pages 50–53, *ante*, that a balancing process rather than implied consent alone is required, we conclude that the stopping of the vehicle at the gate may not be justified upon the basis of implied consent. (*See* also, *infra*, page 61). The cases considered thus far are not dispositive, but the analyses utilized in deciding the reasonableness of the various actions therein clothe the skeleton of the concept of reasonableness with at least the basic raiments. To complete the wardrobe we turn to a series of recent Supreme Court decisions which are directly in point, *i. e.*, those dealing with activities of the Border Patrol at fixed checkpoints or on roving patrols away from the border or its functional equivalent. *See* generally *United States v. Alvarez-Gonzalez*, 561 F.2d 620 (5th Cir. 1977), for a discussion of the concept of functional equivalence.

### V

Stopping a vehicle at a checkpoint must be "tested against the constitutional mandate of reasonableness . . . " *See Camara v. Municipal Court*, 387 U.S. 523, 534, 87 S.Ct. 1727, 1734, 18 L.Ed.2d 930 (1967). This is accomplished by striking "a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers . . . " *United States v. Brignoni-Ponce*, 422 U.S. 873, 878, 95 S.Ct. 2574, 2579, 45 L.Ed.2d 607 (1975).

---

**17.** *Cf. United States v. Croft*, 429 F.2d 884 (10th Cir. 1970).

At least in the context of dealing with a particular crime, the Fourth Amendment has already determined the balance by permitting (with certain exceptions) a search of a particular dwelling only if based upon a warrant supported by particularized probable cause. In some other situations, however, the only test for reasonableness is "balancing the need to search against the invasion which the search entails." *Camara v. Municipal Court, supra,* 387 U.S. at 535, 537, 87 S.Ct. at 1735.

While the determination of reasonableness must give "careful consideration" to "an argument that the public interest demands a particular rule," the ultimate issue transcends the matter of whether the intrusion in question may be made at all, and instead depends on whether a warrant is an absolute prerequisite. This decision turns in part on "whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search . . ." Where the need can be met "within the confines of a reasonable search warrant requirement," other considerations besides "the public need argument [are] dispositive." *Id.* at 533, 87 S.Ct. 1733.

Put another way, while the existence of "a compelling need . . . might justify *some* search . . ., the question becomes whether it will justify in any given case the search as carried out . . ." *United States v. Albarado, supra* at 805.

The first case [*Almeida-Sanchez v. United States, supra*] held that for a roving border patrol to stop a vehicle in order to search it for illegal aliens, there must be "probable cause to believe that a car contained illegal aliens, . . ." This requirement was imposed because the "important law enforcement interests" did not outweigh the significant individual "privacy interests." *United States v. Martinez-Fuerte,* 428 U.S. 543, 555, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

A search for illegal aliens at a permanent checkpoint away from the border must also be based on probable cause or consent. *United States v. Ortiz,* 422 U.S. 891, 896–7, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975).

In *United States v. Brignoni-Ponce, supra,* the Supreme Court held that a roving patrol may "stop motorists in the general area of the border for brief inquiry into their residence status" only "if the stopping officer is 'aware of specific articulable facts, together with rational inferences from these facts, that reasonably warrant suspicion' that a vehicle contains illegal aliens." Probable cause or consent was not required because "traffic-checking practices" which were not for the purpose of searching "involve a different balance of public and private interests and appropriately are subject to less stringent constitutional safeguards." Although "significant law enforcement needs" were involved, even the "modest" degree of intrusion into a protected area required some degree of individualized justification. *United States v. Martinez-Fuerte, supra,* 428 U.S. at 555–6, 96 S.Ct. 3074. But "the limited nature of the intrusion" justified a requirement of less than probable cause. *United States v. Brignoni-Ponce, supra.* 422 U.S. at 880, 95 S.Ct. at 2580.

Finally, in *United States v. Martinez-Fuerte, supra,* seven Justices permitted "stops for brief questioning routinely conducted at permanent checkpoints" without "any individualized suspicion." *Id.,* 428 U.S. at 566, 562, 96 S.Ct. at 3086. The questioning was directed only at "citizenship and immigration status." *Id.* at 546, 96 S.Ct. 3074.

In summary, the greater the intrusion, the more need there is for a requirement of probable cause. A stop to search for aliens is a serious intrusion, while a stop to question about citizenship status is "modest" in degree. But whether the *search* is conducted by a roving patrol or at a permanent checkpoint, individualized probable cause must be shown. On the other hand, while a stop for questioning requires articulable suspicion if by a roving patrol, such a stop at a permanent checkpoint may be conducted without "any individualized suspicion." In each case the public need, admittedly serious and legitimate, would only tip the balance against requiring a warrant proce-

dure. Basically, this accommodation was reached for vehicle stops but not for private dwellings,[18] since the latter are "ordinarily afforded the most stringent Fourth Amendment protection . . . [O]ne's expectation of privacy in an automobile and of freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence . . . ." *Id.* at 561, 96 S.Ct. at 3082. This difference required a warrant procedure to conduct area-wide inspection of private dwellings, but did not require probable cause as to a particular dwelling; it also dispensed with the need for a warrant for stopping vehicles, but instead required individualized probable cause or suspicion except for stops occurring at permanent checkpoints for the limited purpose of questioning as to citizenship status.

Thus, analysis of these cases shows that existence of a public need is only the beginning of the inquiry. All other factors must be considered and, to the extent possible, both interests must be accommodated. When the scale is tipped in favor of one interest, the other does not thereby evaporate. Thus, the existence of the need for gate searches is not enough, in and of itself, to justify them. Rather, we perceive that as only one factor to be weighed.

We adopt the treatment of the various aspects of roving patrol-checkpoint stops as a suitable model [19] from which to construct the criteria necessary for balancing the interests in this case. Seven factors were considered by the Supreme Court as part of the balancing process. They will be examined seriatim.

A. *Public Need.* Each of these cases [*Almeida-Sanchez, Ortiz, Brignoni-Ponce, Martinez-Fuerte*] involved the Mexican border. It has been estimated that in 1972 at least a minimum of one million illegal aliens entered the United States, up to possibly even as many as 10–12 million. Of these, 85 percent came from Mexico. Our border with Mexico is 2,000 miles long. In fiscal year 1973—there were 175,511 deportable aliens who were caught at the border itself. Traffic checking operations at permanent checkpoints or by roving patrols caught another 55,300. *Id.* at 551–553, 96 S.Ct. 3074.

The checkpoint involved in *Ortiz* and *Martinez-Fuerte* was located on Interstate Highway 5 at San Clemente, California. Each year ten million cars pass through that checkpoint. In 1973 the Border Patrol caught 17,000 illegal aliens there. *Id.* at 554, 96 S.Ct. 3074.

It is readily apparent that the problem of illegal aliens is tremendous, and combating that problem satisfies a "valid public interest."

B. *Availability of Alternatives.* The Supreme Court recognized that "maintenance of a traffic-checking program in the interior is necessary because the flow of illegal aliens cannot be controlled effectively at the border . . . ." *Id.* at 556, 96 S.Ct. at 3082. [Note: An inspection stop is permitted under the Fourth Amendment because there were no other effective means to enforce license and vehicle registration laws. *Lipton v. United States,* 348 F.2d 591 (9th Cir. 1965).]

C. *Degree of Potential for Frightening or Offending Motorists.* There is an appreciably greater potential for generating "concern or even fright on the part of lawful travelers" when a roving patrol is involved than in the case of a checkpoint. As was pointed out in *Ortiz,*

> Roving patrols often operate at night on seldom-traveled roads, and their approach may frighten motorists. At traffic checkpoints the motorist can see that other vehicles are being stopped, he can see visible signs of the officers' authority, and he is much less likely to be frightened or annoyed by the intrusion. Supra, 422 U.S. at 894–895, 95 S.Ct. at 2588.

D. *Scope of the Intrusion.* As has been shown, the presence or absence of a search

---

18. *Camara v. Municipal Court, supra.*

19. *Camara v. Municipal Court, supra,* was rejected as a model in *United States v. Martinez-Fuerte, supra* at 564–5, 96 S.Ct. 3074.

as the purpose of the stop is a decisive factor in the balancing process.[20]

E. *Extent of Interference with Legitimate Traffic.* Roving patrols involve a significant "degree of interference with lawful traffic" within a 100-mile radius of the border. Indeed, it may be said that "substantially all of the traffic in" communities in the area covered by the roving patrols is legitimate in nature and "relatively few of their residents have any connection with the illegal entry and transportation of aliens." Law-abiding citizens may not be subject "to potentially unlimited interference with their use of the highways, solely at the discretion of" police officers. *United States v. Brignoni-Ponce, supra,* 422 U.S. at 882–3, 95 S.Ct. at 2581.

Different considerations apply to fixed checkpoints, where either all cars are stopped (except local residents who are recognized and waved through), 428 U.S. at 550, 96 S.Ct. 3074, or only random stops are made,[21] as was pointed out in *United States v. Martinez-Fuerte:*

> Routine checkpoint stops do not intrude similarly on the motoring public. First, the potential interference with legitimate traffic is minimal. Motorists using these highways are not taken by surprise as they know, or may obtain knowledge of, the location of the checkpoints and will not be stopped elsewhere. Second, checkpoint operations both appear to and actually involve less discretionary enforcement activity. The regularized manner in which established checkpoints are operated is visible evidence, reassuring to law abiding motorists, that the stops are duly

authorized and believed to serve the public interest. The location of a fixed checkpoint is not chosen by officers in the field, but by officials responsible for making overall decisions as to the most effective allocation of limited enforcement resources. We may assume that such officials will be unlikely to locate a checkpoint where it bears arbitrarily or oppressively on motorists as a class. And since field officers may stop only those cars passing the checkpoint, there is less room for abusive or harassing stops of individuals than there was in the case of roving-patrol stops. Moreover, a claim that a particular exercise of discretion in locating or operating a checkpoint is unreasonable is subject to post-stop judicial review. *Id.* at 559, 96 S.Ct. at 3083.

F. *Amount of Discretion Involved.* "The principal protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." *Id.* at 566–67, 96 S.Ct. at 3086. On the one hand, roving patrol operations present "a grave danger that [the] unreviewable discretion [to stop legitimate traffic] would be abused by some officers in the field." *Id.* at 559, 96 S.Ct. at 3083.

At the same time, checkpoint searches involved only about 3% of the cars that pass the San Clemente checkpoint. Thus, "checkpoint officers [apparently] exercise a substantial degree of discretion in deciding what cars to search . . ." However, the Fourth Amendment will not tolerate that

> degree of discretion to search private automobiles . . . A search, even of an

---

20. The limited purpose of random stops to check driver's license and vehicle registration was determinative of the validity of the "random or arbitrary" vehicle stop in *United States v. Jenkins,* 528 F.2d 713, 714 (10th Cir. 1975). The reasoning in *Martinez-Fuerte* would not be needed to support this inspection stop. 428 U.S. at 560 (fn. 14), 96 S.Ct. 3074; *see also United States v. Ortiz, supra,* 422 U.S. at 897 (fn. 3), 95 S.Ct. 2585. Such an inspection stop is completed "once the check is satisfactorily made," and it "cannot justify [any] further investigation." It is strictly limited in scope. *United States v. Harris,* 404 F.Supp. at 1123.

However, where the real purpose of the stop was to check for stolen vehicles, rather than to check for driver's license and registration, the stop was held illegal in *U. S. v. Carrizoza-Gaxiola,* 523 F.2d 239, 241 (9th Cir. 1975), absent "founded suspicion." Such "an investigative stop" was upheld in *United States v. Harris, supra.*

21. 428 U.S. at 546, 96 S.Ct. 3074. Thus it is reasonable to stop every vehicle passing the checkpoint. Whether that is practical does not affect reasonableness. *See United States v. Blade, supra.*

automobile, is a substantial invasion of privacy. To protect that privacy from official arbitrariness, the Court always has regarded probable cause as the minimum requirement for a lawful search. *United States v. Ortiz,* 422 U.S. at 896, 95 S.Ct. at 2588.

However, checkpoint stops for questioning involve an "intrusion [which] is sufficiently minimal that no particularized reason need exist to justify it." Therefore, "wide discretion in selecting the motorists to be" questioned is permissible. *United States v. Martinez-Fuerte, supra,* 428 U.S. at 563–64, 96 S.Ct. at 3085. Such stops are unlike the situation in warrantless health and safety inspections where

the occupant has no way of knowing whether enforcement of the municipal code involved requires inspection of his premises, no way of knowing the lawful limits of the inspector's power to search, and no way of knowing whether the inspector himself is acting under proper authorization. 387 U.S. at 532, 87 S.Ct. at 1732.

The checkpoint at San Clemente, California, has signs at three locations:

1 mile away—signs: "ALL VEHICLES, STOP AHEAD, 1 MILE"

¾ mile away—signs: "WATCH FOR BRAKE LIGHTS"

At checkpoint—signs: "STOP HERE—U. S. OFFICERS"

At the checkpoint, traffic cones are set up so that traffic can only use two lanes, between which a uniformed Border Patrolman stands. He screens all approaching vehicles and decides which ones to stop. *Id.* at 545–6, 87 S.Ct. 1727.

These "visible manifestations of the field officers' authority at a checkpoint provide substantially the same assurances" as were required for health and safety inspections. *Supra,* 428 U.S. at 565, 96 S.Ct. at 3086.

G. *Practicality of Requirement of Reasonable Suspicion.* A search by roving patrol officers requires reasonable suspicion because "the nature of illegal alien traffic and the characteristics of smuggling operations tend to generate articulable grounds for identifying violators . . ." *United States v. Brignoni-Ponce,* 422 U.S. at 883, 95 S.Ct. at 2581. But such a requirement cannot apply to a stop at a fixed checkpoint on major highways inland since "the flow of traffic tends to be too heavy to allow the particularized study of a given car that would allow it to be identified as a possible carrier of illegal aliens . . ." *United States v. Martinez-Fuerte,* 428 U.S. at 557, 96 S.Ct. at 3082. In addition, the "well-disguised" nature of "smuggling operations" would not be effectively deterred if it were known that there had to be some reason for a stop. *Id.* The result would be that any conceivable basis for suspicion could be eliminated by the ingenuity of the smugglers.

Thus, we believe that this series of border stop cases provides a model for assessing the reasonableness of gate searches. In fact, it would appear that *United States v. Martinez-Fuerte, supra,* controls the result in this case. However, it is most important that the Supreme Court pointedly and circumspectly stated that "our holding today is limited to the type of stops described in this opinion." Probable cause or consent would be required for any other activity. *Id.* at 567, 96 S.Ct. at 3085. Since the type of stop there was solely for the purpose of brief questioning about citizenship and immigration status, no other type of stop may be similarly justified. The random stop used at the Twentynine Palms Base gate was definitely not the same kind as in *Martinez-Fuerte.* However, the analysis therein lends itself to use in this case so that we may determine the appropriate balance.

VI

We now proceed to examine the foregoing factors involved in the balancing process of assessing the reasonableness of the operation conducted in this case.

A. *Public Need.*

The nature of the military's drug problem in general was mentioned in *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975).

Compared to the problems encountered with illegal aliens, which nevertheless resulted in the variable balance previously discussed, the drug problem in the military may not appear so significant. However, we have previously announced our view that "use of marihuana and narcotics by military persons . . . has special military significance" in light of the " 'disastrous effects [of these substances] on the health, morale and fitness for duty of persons in the Armed Forces.' " *United States v. Beeker,* 18 U.S.C.M.A. 563, 565, 40 C.M.R. 275, 277 (1969). We are, therefore, satisfied that the problem is serious enough that the need for deterrent measures is significant. ". . . [T]he number of instances does not alone determine the danger and the need to oppose it . . ." *United States v. Unrue, supra* at 470, 47 C.M.R. 560. *See also Hirabayashi v. United States,* 320 U.S. 81, 105, 106–107, 63 S.Ct. 1375, 87 L.Ed. 1774 (Douglas, J., concurring).

### B. *Available Alternatives.*

Judge Latimer, in his dissenting opinion in *United States v. Brown,* 10 U.S.C.M.A. 482, 493, 28 C.M.R. 48, 59 (1959), stated that "searching is the only effective way to reach the evil if the smuggling is being done." Although the record does not contain any evidence on this matter, we can readily see the logic beyond the notion that preventing introduction of the substance onto the base is an extremely effective method of combatting its use on base.

### C. *Degree of Potential for Frightening or Offending Motorists.*

Because the stop occurs at a checkpoint, this potential is far less than for a roving patrol. And there would be minimal "visible signs of the officers' authority" from any sign announcing the checkpoint. *See infra,* page 63.

### D. *Scope of the Intrusion.*

This is a stop for a search [22] which the Supreme Court has said is a serious intrusion.[23] But that view was directed to an extensive examination of the interior of the vehicle by a Border Patrolman,[24] while here the intrusion was to be accomplished by a narcotics detection dog relying exclusively on its sense of smell. But it is not so extensive as that employed by the Border Patrol. Therefore, while the intrusion would not be so great as in *Almeida-Sanchez,* neither is it so modest as in *Martinez-Fuerte.* That appellant was riding as a passenger in a private vehicle does not deprive him of an expectation of privacy. Rather he has, "at least under our Constitution, the right to expect, that no matter the threat, the search to counter it will be as limited as possible, consistent with meeting the threat." *United States v. Albarado, supra* at 806.

### E. *Extent of Interference with Legitimate Traffic.*

While the record shows that from 50 to 75 vehicles were stopped at the gate by Sergeant Paschall, it does not disclose any information about the daily traffic on board the base. For purposes of this appeal, however, we will assume the extent of interference with legitimate traffic was minimal.

### F. *Amount of Discretion Involved.*

In *United States v. Poundstone, United States v. Unrue,* and *United States v. Blade,* all *supra,* there was no discretion exercised at all. On the other hand, the roving patrol operation in *Brignoni-Ponce* involved almost unlimited discretion. In this case there was no discretion as to where to conduct the searches (at the gate). However, as to the procedure to be followed in carrying out the search, the record does not show who chose which gate to cover, when or for how long. But it does show conclusively that the handler alone would

---

**22.** But it is not like the kind of search condemned in *United States v. Lange,* 15 U.S.C. M.A. 486, 35 C.M.R. 458 (1965), or in *United States v. Chase, supra.*

**23.** *See United States v. Ortiz, supra.*

**24.** *See id.,* 422 U.S. at 894 (fn. 1), 95 S.Ct. 2585.

choose which vehicle to stop. Whether he relied upon the readiness of the dog or upon some other criteria, the fact remains that the policeman decided which method of selection to use.

The danger of permitting the exercise of discretion in conducting this operation is the same danger arising in airport searches, *i. e,* "the possibility that the purpose of the . . . search may degenerate from the original search for weapons to a general search for contraband . . ." *United States v. Albarado, supra* at 805; *United States v. Davis, supra* at 909. The gate searches have as their purpose the apprehension and deterrence of drug offenders. Thus, the danger of a "general search for contraband" is the reality here, because that is indeed the purpose. Yet, the Court said in *United States v. Almeida-Sanchez, supra,* 413 U.S. at 273, 93 S.Ct. at 2540:

> It is not enough to argue, as does the Government, that the problem of deterring unlawful entry by aliens across long expanses of national boundaries is a serious one. The needs of law enforcement stand in constant tension with the Constitution's protections of the individual against certain exercises of official power. It is precisely the predictability of these pressures that counsels a resolute loyalty to constitutional safeguards. . .

Thus, the existence of any discretion on the part of law enforcement officers weighs heavily in the balance against reasonableness.

G. *Practicality of Requiring Reasonable Suspicion.*

Considerations similar to those affecting the model apply here.

Based, then, upon the foregoing factors, the decision in *United States v. Ortiz, supra,* requiring individualized probable cause or consent would govern. Unless significant additional factors may be suggested, that result must prevail. We will now consider several other factors.

(1) *The nature of the vehicle.*

Appellant was stopped at the gate while riding as a passenger in a private vehicle operated by a fellow Marine. Therefore, the following observation in *United States v. Harris, supra,* 404 F.Supp. at 1126, is pertinent:

> The Supreme Court has recognized, however, that an individual's privacy interest in an automobile is less compelling than in a home. The Court in *Preston v. United States,* 376 U.S. 364, 366, 84 S.Ct. 881, 883, 11 L.Ed.2d 777 (1964) stated:
>
>> [W]hat may be an unreasonable search of a house may be reasonable in the case of a motorcar.
>
> *We likewise believe that what may be an unreasonable seizure of the occupants of an automobile may be reasonable in the case of the occupants of a commercial tractor-trailer.*

Thus, the fact that the appellant was a passenger in a private vehicle is but one of the factors to be considered in evaluating the reasonableness of the activity here.

(2) *The commander's responsibilities.*

By virtue of his position, the commander of a military installation has acquired unique responsibilities in connection with the health, safety, welfare, morale, and efficiency of those placed under his command. This is the result of the manifest necessity that his personnel be kept at peak efficiency in order that the performance of his mission will not be jeopardized. Navy Regulations recognize that his "responsibility . . . for his command is [virtually] absolute" and that his "authority . . . is commensurate with his responsibility." Article 0702.1, U.S. Navy Regulations (1973).

(3) *Right and duty to enter the base*

Appellant was assigned to the Marine Corps Communication Electronics School, which is located at Marine Corps Base, Twentynine Palms, California. Therefore, he had the duty and the right to admission onto the base, which was not true in *United States v. Poundstone, supra,* since that accused was not assigned to the base camp

where the search was conducted. 22 U.S.C. M.A. at 282, 46 C.M.R. at 282. This right and duty is of paramount importance, for it is the feature distinguishing this case from the airport search cases such as *United States v. Davis, supra,* which relied extensively on "the right of a person to avoid search by electing not to board the aircraft." 482 F.2d at 910–11. *See also United States v. Albarado,* 495 F.2d at 808, where even that option was not enough to validate the search conducted there. Only the most minimal conditions may be imposed upon his right of entry, *unless* he is given the option of not being punished for exercising his "right . . . to avoid search by electing not to" enter the base. Indeed, the impracticality of such an option renders it an unrealistic possibility.

*(4) Security considerations*

This Court "has never found it necessary to specifically decide whether a gateway search based solely on the need for security is permissible in the absence of either probable cause or consent. . . ." *United States v. Blade,* 49 C.M.R. at 648. In *United States v. Poundstone, supra,* Chief Judge Darden concurred in the decision that the gate search was valid based upon the commander's "authority and responsibility for the security of his command." 22 U.S.C. M.A. at 282, 46 C.M.R. at 282. He concluded

> that the commanding officer's traditional authority and responsibility for the security of a military base and its personnel are sufficiently broad to permit him constitutionally to search all those who enter or leave the installation's perimeters. *Id.* at 283.

As support for his conclusions, he cited *Cafeteria and Restaurant Workers Union v. McElroy,* 367 U.S. 886, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). However, that case recognized that, while the commander has historically been authorized to exclude persons from his post, that power has only extended to " 'all persons other than those belonging to his post.' " JAGA, 1904/16272, May 6, 1904; JAGA 1925/680.44, October 6, 1925. The Court also recognized "the historically unquestioned power of a commanding officer summarily to exclude civilians from the area of his command." 367 U.S. at 893, 81 S.Ct. at 1748. Thus, quite explicitly, *Cafeteria Workers* in no way supports the exclusion of military members from the base to which they are assigned, for security or any other reasons. And it is significant that the Court rejected the notion "that, because [the civilian] had no constitutional right to be there in the first place," she was therefore deprived of all constitutional protections in connection with the denial of access. *Id.* at 894, 81 S.Ct. at 1748. For these reasons, *Cafeteria Workers* does not support Chief Judge Darden's thesis.

In *United States v. Vaughan,* 475 F.2d 1262 (10th Cir. 1973), the Court agreed "that a person within the restricted area of a military reservation is subject to having his person and his vehicle searched in the interest of military security," and "that submitting to search could be validly imposed as a condition to gaining access to a military reservation." *Id.* at 1263. However, this dicta was limited to civilians, since Vaughan was a civilian whose wife worked on base. The search of his vehicle when he sought entry to the base was held invalid because the gate guards did not intend to allow him to enter anyway. Considered in light of the prior discussion of *Cafeteria Workers,* and the facts in *Vaughan,* the dicta there does not apply to military personnel assigned to the base.

The Government, in *Vaughan,* relied on *United States v. Crowley,* 9 F.2d 927 (N.D. Ga.1922), as support for the search. When Crowley (a civilian) drove his taxicab into Fort Benning, Georgia, he was stopped and told his car would be searched. He was not permitted to leave, but was required to disembark. Illicit liquor was discovered and he was turned over to federal authorities for prosecution. A general order permitted stopping and searching "suspected cars, except those of officers in uniform." *Id.* The District Judge bottomed his conclusion that the search was valid upon a

finding of implied consent. He noted that the purpose of the search was deterrence of wrongful importation of contraband rather than discovery of "evidence of a crime." The *Crowley* decision has been cited as authority for the "widely recognized" proposition that "a military picket [may] search any automobile entering a military reservation." *United States v. Grisby*, 335 F.2d 652, 655 (4th Cir. 1964). However, this is limited to civilians and is based on implied consent. (*See* page 53, *ante.*)

*United States v. Ellis*, 547 F.2d 863 (5th Cir. 1977), upheld a search of a vehicle owned by a civilian who was a visitor on a Naval Air Station. The visitor had accepted a pass which expressly provided that "[a]cceptance of this pass gives your consent to search this vehicle while entering, aboard, or leaving this station." *Id.* at 865. (fn. 1) Specific recognition was given to this principle which had been reaffirmed in *Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976): "A base commander may summarily exclude all civilians from the area of his command." 547 F.2d at 866. By its terms *Ellis* does not support a search of a vehicle belonging to a serviceperson assigned to the base involved. But it does suggest that *perhaps* the right of a serviceperson to drive on base may be conditioned upon an agreement to permit searches without probable cause or express consent. Indeed paragraph 2–1e of Marine Corps Order 5110. 1B provides for implied consent to a blood, breath or urine test for alcohol content as a condition to driving on base. However, that consent comes into play only if probable cause exists. "The test shall be incidental to a lawful apprehension." But this is the law without any implied consent. *Schmerber v. California*, 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966). And *United States v. Blade, supra* at 651, recognized the "right to bring his car onto the base and park it where he resides or works." Conditioning such right upon an agreement to permit a *search* would collide with the Fourth Amendment. We know of no state law requiring consent to *search* as a condition to obtaining a license. Inspection of a vehicle for mechan-

ical defects is not a search. Everything we say in this opinion is opposed to such a condition. *See Commonwealth v. Swanger*, 307 A.2d at 879.

▮ From these cases it is clear that the authority to maintain security of a military installation has been considered unlimited only as to civilians. It is in this light that we must consider the provisions of the Internal Security Act, 50 U.S.C. 797, to determine its effect on this issue. Section 797(a) punishes any willful violation of a

> regulation or order . . . for the protection of security of military or naval aircraft, . . . bases, forts, posts, . . ., relating to fire hazards, fire protection, lighting, machinery, guard service, disrepair, disuse or other unsatisfactory conditions thereon, or the ingress thereto or egress or removal of persons therefrom, or otherwise providing for safeguarding the same against destruction, loss, or injury by accident or by enemy actions, sabotage or other subversive actions, . . .

Department of Defense Directive 5200.8 dated August 20, 1954, and OPNAVINSTR 5510.45B were issued pursuant to this statute.

The language of section 797 establishes that it is intended to punish anyone who enters a military installation without the permission of the commander. As a condition for entry, the cited regulation permits the commander to order a search of person and property, and to limit ingress to the installation. But in view of the serviceman's right and duty to enter the installation (at least if he is assigned there), such provisions cannot lawfully apply to him. Once he produces a valid military identification card, he is entitled to entry upon the installation. OPNAVINSTR 551. 01 E provides procedures for granting security clearances to personnel. *See* Chapter VII, section 1. The extent of investigation required for such clearances is within the discretion of the services. Whether they choose to require clearances for all or only some of their personnel is also for them to

decide. The point is that this tool is deemed sufficient to permit access to varying degrees of classified material, and certainly such an expression of confidence satisfies any requirement for protecting the security of the base, at least concerning the recipient of the clearance. That a particular serviceperson has no clearance is also within the discretion of the services, but that is no excuse for treating those with a clearance the same as one without a clearance. There is time enough for us to deal elsewhere with the degree, if any, to which those without a clearance may be treated differently from other servicepersons.

In making this interpretation of the statute, we are acutely aware of what Mr. Justice Stewart said in *Almeida-Sanchez v. United States, supra*, about judicial responsibility towards statutes:

[N]o act of Congress can authorize a violation of the Constitution. But under familiar principles of constitutional adjudication, our duty is to construe the statute, if possible, in a manner consistent with the Fourth Amendment.

413 U.S. at 272, 93 S.Ct. at 2539.

By construing the statute and regulation to exclude servicepersons,[25] it becomes unnecessary to decide the very difficult question of the extent to which the serviceperson's protection against unreasonable searches and seizures may be diminished by statute or regulation. That construction appears to have been the philosophy of the majority in *Poundstone* and *Unrue,* since in both cases they considered the regulation to be irrelevant to the issue. Only Judge Duncan (dissenting) seemed concerned about its applicability, but even he felt it was probably not intended to apply to servicepersons. *See* 22 U.S.C.M.A. at 283, 46 C.M.R. at 283 (fn.1).

For reasons to be stated elsewhere in this opinion, reliance on the statute and regulation is not necessary to sustain the gate search concept. *See United States v. Unrue, supra* at 469, 47 C.M.R. at 559. Even if the statute and regulation were applicable, their validity still would be governed by our determination regarding the procedures required for a reasonable gate search.

We believe that the treatment of the commander's authority in *United States v. Burrow,* 396 F.Supp. 890 (D.C.Md.1975), is highly instructive. There, United States District Judge Murray stated:

Reasonableness, . . ., is a flexible standard. It has long been recognized that military personnel, and those who enter upon a military reservation, surrender some of their individual rights so that military discipline and security may remain inviolate. (Cites omitted). It is equally well established that the courts have recognized the commander's duty to maintain the order, security and discipline necessary to military operations. (Cites omitted).

The means by which this duty may be fulfilled, however, vary, and, therefore, a court should take into consideration a number of factors when called upon to determine the reasonableness of an intrusion upon the constitutional rights of others. Included among these factors are considerations such as the nature of the military installation, the competing interests of the individual on the one hand and that of the military on the other, and the specific nature of the method utilized by the commander in so affecting another's constitutional rights.

As to the nature of the military installation, . . . the 'open' or 'closed' character of the post is a critical factor in judging the propriety *vel non* of the commander's action. (*Id.* at 898).

\*    \*    \*    \*    \*    \*

The more the public or national interest is involved, as in the case of a closed, top-security installation, the more the ju-

---

**25.** This construction is reinforced by the fact that such a statute is only needed for civilians, since the commander already had authority to prescribe entry and exit procedures for servicepersons, and any violation of his orders by a serviceperson would have been punishable under Article of War 64 when the Internal Security Act was passed and now under UCMJ, Articles 90 and 92.

diciary may weigh this [the commander's duty to maintain security, order and discipline within his command and over his installation] in the scale in determining whether the recognized constitutional right of individuals, including civilians who seek and gain entrance to military installations, to be free from unreasonable searches has been invaded.

When this [Fourth Amendment] right comes into conflict with another well recognized interest [maintenance of base security], the courts must engage in a sensitive balancing test. The resolution of the issue must, therefore, hinge upon the reasonableness of the method or means employed by the authority infringing on another's constitutional right to be free from unreasonable searches and seizures. *Id.* at 900–901.

Thus, if a base is "closed," security weighs more heavily in the "sensitive balancing" process than if the base were "open."

The facts of each case must be evaluated to determine whether the location in question is on a "closed" or an "open" part of the base. *United States v. Gourley*, 502 F.2d 785 (10th Cir. 1973). In *United States v. Floyd*, 477 F.2d 217 (10th Cir. 1973), *cert. denied* 414 U.S. 1044, 94 S.Ct. 550, 38 L.Ed.2d 336 (1973), the Court relied upon paragraph 6(a)(1), A.F.R. 125–37, dated July 27, 1964, for the definition of a closed base, which will be:

(a) Posted with warning signs at all perimeter gates and along the base perimeter.

(b) Patrolled internally by air police forces in vehicles. Air police forces will be assigned at perimeter gates, when open, to control personnel and vehicle traffic.

(c) Fenced around the perimeter, when practicable.

*Id.* at 223 n. 3.

This record does not reflect the exact nature of the base in question. While government counsel refer to it as a closed base, *Gourley* makes it clear that labels are not controlling. *Id.* at 788. For purposes of this case we will treat this base as closed.

Paragraph 0660a, OPNAVINSTR 5510.-45B, states that warning signs should be posted at each entry point [26] and sets forth suggested wording as follows:

"Warning, Restricted Area, it is unlawful to enter this area without permission of the commanding officer. While on this [installation] all personnel and property under their control are subject to search. (Sec. 21, Internal Security Act of 1950; 50 U.S.C. 797)."

In *United States v. Blade*, 49 C.M.R. at 649, the United States Air Force Court of Military Review considered that the "compelling necessity for security" is a strong reason "to lessen the reasonableness of an expectation that a person would be entirely free from examination or surveillance when passing through the gateway of an Air Force Base." . . . We decline to adopt that view. It has been recognized that the reasonableness of an expectation of privacy is not reduced because an intrusion upon it "has occurred often enough." *United States v. Davis*, 482 F.2d at 905. The reasonableness of an expectation of privacy must first be determined outside the context of the questioned activity; only after that determination is made is it proper to balance the reasons for the intrusion against the need to protect that privacy. The balance process fixes the permissible scope of the intrusion, not the reasonableness of the expectation of privacy. *Almeida-Sanchez, Ortiz, Brignoni-Ponce* and *Martinez-Fuerte* all recognized that the individual's expectation of privacy against having his vehicle stopped was reasonable enough to justify only the most limited intrusion without either articulable suspicion, probable cause or consent. A serviceman who drives up to the gate of the installation to which he is assigned, and presents the requisite identification, may reasonably expect no less a degree of privacy. Unlike *Colonnade* and *Biswell*, appellant's justifiable expectation of privacy has not been reduced

---

**26.** Such notice is an indicia of reasonableness in any search procedure.

by any "special perquisite" bestowed upon him. *Almeida-Sanchez v. United States,* 413 U.S. at 281, 93 S.Ct. 2535 (Powell, J., concurring).

Security has been an impetus for searches in other contexts. For example, *Downing v. Kunzig,* 454 F.2d 1230 (6th Cir. 1972), considered the validity of conditioning entry into the Federal Building in Detroit upon submitting all packages for inspection by a guard. This was part of a program instituted in all Federal Buildings as a result of innumerable bomb threats and some bombings of those buildings. Thus, there was a serious threat, both to the buildings and naturally, to the employees working in them. Refusal to submit a package for inspection resulted in denial of entry into the building. An attorney refused to permit a guard to examine his briefcase nor would he leave it with the guard while he went upstairs in the building.[27] He was scheduled to appear at a hearing in federal district court there. However, he was denied entry and later sued for a declaratory judgment that the procedure was invalid under the Fourth Amendment. The Court

upheld the validity of this kind of inspection because "it was cursory in nature and made for the strictly limited purpose of determining that no explosives or dangerous weapons were transported into the building." Therefore, it was a reasonable response to the "direct and immediate" threat to federal property which was "likely to materialize into acts of violence and destruction in any part of the nation. . ." *Id.* at 1232. The building involved was the location of the offices of federal district and appellate judges, congressional staff, and many other federal agencies. In this emergency situation such steps were reasonable, especially in a building "designed to be used strictly for governmental purposes." *Id.* at 1233.

Particularly, the absence therein of any degree of discretion on the part of the guards is significant. *See McMorris v. Alioto,* 567 F.2d 897 (9th Cir. 1978).

*Military necessity.*[28] The Court below mentioned military necessity as a basis for this search. So did this Court in *Unrue,* where the dissent emphasized its disagreement with the findings of military necessi-

---

27. The procedure later changed to respect this position. *Id.* at 1232.

28. While the term "military necessity" has appeared in many cases in this Court as well as in civilian appellate courts, discussion of its meaning has been rare. *See United States v. Russell,* 13 Wall. 623, 627–8, 20 L.Ed. 474, 475 (1871); *Korematsu v. United States,* 323 U.S. 214, 233, 234, 65 S.Ct. 193, 89 L.Ed. 194 (Murphy J., dissenting) (1944). In context some cases may provide insight into its meaning: *United States v. Grow,* 3 U.S. C.M.A. 77, 11 C.M.R. 77 (1953); *United States v. Hooper,* 5 U.S.C.M.A. 391, 396–8, 18 C.M.R. 15 (1955); *United States v. Robinson,* 6 U.S.C.M.A. 347, 352–3, 20 C.M.R. 63 (1955); *United States v. Milldebrandt,* 8 U.S.C.M.A. 635, 638, 25 C.M.R. 139 (1958); *United States v. Davis,* 19 U.S.C. M.A. 217, 223–4, 41 C.M.R. 217 (1970); *United States v. Howard,* 19 U.S.C.M.A. 547, 551, 42 C.M.R. 149 (1970); *United States v. Mohr,* 21 U.S.C.M.A. 360, 367, 45 C.M.R. 134 (1973); *United States v. Ruiz,* 23 U.S.C.M.A. 181, 183, 48 C.M.R. 797 (1974). Other cases merely mention the term without any discussion. They will be referred to only by C.M.R. citation (CMR/page) since they are only of academic interest: 6/92; 17/122; 18/187; 21/149; 21/201; 22/41; 24/240; 27/316; 29/275; 33/68; 226; 36/309; 37/64; 38/78; 40/74;

45/163. The term has also been mentioned in the following Supreme Court decisions: *Sterling v. Constantin,* 287 U.S. 378, 390–2, 402–4, 53 S.Ct. 190, 77 L.Ed. 375 (1932); *Hirabayashi v. United States,* 320 U.S. 81, 86, 88, 113, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *Korematsu v. United States, supra* at 227, 235, 240–1, 65 S.Ct. 193, 89 L.Ed. 194 (1944); *In re Yamashita,* 327 U.S. 1, 14, 24, 27, 46, 50, 78, 66 S.Ct. 340, 90 L.Ed. 499 (1946); *Duncan v. Kahanamoku,* 327 U.S. 304, 328, 66 S.Ct. 606, 90 L.Ed. 688 (1946); *NLRB v. Jones and Laughlin Corp.,* 331 U.S. 416, 426, 67 S.Ct. 1274, 91 L.Ed. 1575 (1947); *Libby et al. v. United States,* 340 U.S. 71, 73–5, 71 S.Ct. 144, 95 L.Ed. 86 (1950); *Youngstown Sheet and Tube Co. v. Sawyer,* 343 U.S. 579, 661, 686, 72 S.Ct. 863, 96 L.Ed. 1153 (1952); *Reid v. Covert,* 354 U.S. 1, 46, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Laird v. Tatum,* 408 U.S. 1, 20, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972); *Parker v. Levy,* 417 U.S. 733, 788, 94 S.Ct. 2547, 41 L.Ed.2d 439 (1974). *See also United States v. Pierce,* 505 F.2d 1053, 1055–6 (1st Cir. 1974); *Hess v. Schlesinger,* 159 U.S. App.D.C. 51, 53, 486 F.2d 1311, 1313 (1973); *Anderson v. Laird,* 151 U.S.App.D.C. 112, 126, 133, 139, 466 F.2d 283, 297, 304, 310 (1972), *cert. denied,* 409 U.S. 1076, 93 S.Ct. 690, 34 L.Ed.2d 665.

ty. 22 U.S.C.M.A. 466, 469, 471, 47 C.M.R. 556, 559, 561 (1973). In *Middendorf v. Henry,* 425 U.S. 25, 96 S.Ct. 1281, 47 L.Ed.2d 556 (1976), the Supreme Court recognized that a finding by Congress that "military necessity" justified not providing counsel at a summary court-martial was entitled to "particular deference" unless "the factors militating in favor of counsel at summary courts-martial are so extraordinarily weighty as to overcome the balance struck by Congress." *Id.* at 43–44, 96 S.Ct. at 1292. Thus *Middendorf* recognized that military necessity is only a factor, rather than a determinant, in the balancing process. Indeed, in *United States v. Carpenter,* 1 M.J. 384 (C.M.A.1976), we recognized the importance of military necessity, but nevertheless held that once a witness is found to be material, military necessity has bearing only on the matter of "when his testimony can be presented," not whether it will be presented at all. Likewise, military necessity is a significant, even overriding, factor in determining whether a gate search without probable cause or consent may be made at all, but it does not control the decision of how it may be conducted.

*Comparison with regulation of prisons.* In the *Selective Draft Law Cases,* 245 U.S. 366, 390, 38 S.Ct. 159, 62 L.Ed. 349 (1918), the Supreme Court held that service in the armed forces was not a form of involuntary servitude. We intend to insure that that principle remains viable. To do this we take cognizance of the permissible activities employed by penal institutions in the interests of security. *Bonner v. Coughlin,* 517 F.2d 1311 (7th Cir. 1975); *Gettleman v. Werner,* 377 F.Supp. 445 (W.D.Pa., 1974). *See also United States v. Maglito,* 20 U.S.C. M.A. 456, 43 C.M.R. 296 (1971). While there may be special categories of installations

which require comparable measures, such as weapons storage areas or missile complexes, most installations cannot qualify for such measures. Therefore, strong proof of need will be required before we permit subjection of servicemen to treatment comparable to persons incarcerated in institutions. Put another way, there is a presumption that such treatment is unreasonable and only the clearest proof of necessity can overcome it. Indeed, such proof will not be found in a silent record.

## CONCLUSION

■ Upon balancing all the factors discussed thus far, we are convinced that use of gate searches to deter persons from introducing contraband onto a military installation is an eminently reasonable response to a serious problem affecting the military. *See Committee for G.I. Rights v. Callaway,* 171 U.S.App.D.C. 73, 518 F.2d 466 (1975). But this conclusion does not resolve the issue before us. To insure the least possible intrusion into the constitutionally protected area, and thereby preserve freedom from unreasonable invasions of personal privacy, a procedure[29] must be employed which completely removes the exercise of discretion from persons engaged in law enforcement activities. This contemplates a completely independent determination of times when the searches will be conducted, the method of selecting the vehicles to be stopped,[30] the location of the operation, and the procedure to be followed in the event something is discovered.

In establishing a program for gate searches, the commander should keep in mind the admonition of 18 U.S.C.A., Fed. Rules Cr.Pro. 41 (notes 73–74) and *Almeida-Sanchez v. United States,* 413 U.S. at 283 (n. 3), 93 S.Ct. 2535 (Powell, J., concurring).

29. This does not apply to an emergency situation, such as a fleeing felon, nor does it apply to a routine stop of a person entering an installation to check his identification.

30. It may be feasible or desirable for the commander to delegate the function of actually selecting vehicles to an officer who is neutral in outlook and has no connection with law enforcement activities. This officer could be given absolute discretion to make these selections on the scene, so long as he makes a completely independent decision without advice or suggestions from law enforcement officials. The presence of an officer during implementation of the procedure will place the stamp of authority on the activity and persons approaching the gate will have no cause for alarm or annoyance.

We do not set out the specifics of the procedure but rather leave implementation of this decision to those who possess the authority to promulgate regulations relating to the security of military personnel and installations. The reasonableness of any procedure may be litigated in an appropriate proceeding, and we will consider each factual situation as it comes before us.

■ The case before us involved stopping a privately owned vehicle driven by American military personnel at the gate of a base in the United States. As has been said, the operation anywhere is a general search for evidence of contraband. That purpose, while permissible in this context, can only be tolerated if there is *no* possibility that law enforcement officers may exercise any discretion. Here, there was absolutely nothing except the dog handler's *own* standard which determined whether to search a particular vehicle. While the handler must decide when his dog is ready for an operation, that decision simply involves too much discretion to serve as an independent basis for selection of vehicles to be stopped.

Because the law enforcement officer involved in this operation was permitted to exercise discretion concerning important aspects of the procedure, we conclude that the stop of the vehicle at the gate for the purpose of a search was unreasonable, and the evidence obtained as a result of that stop was inadmissible. There being no admissible substitute for this evidence, the findings of guilty of the specification of the charge cannot stand.

The decision of the United States Navy Court of Military Review is reversed. The findings and sentence are set aside. The charge is dismissed.

FLETCHER, Chief Judge (concurring):

I concur, but have a few words to add. The seizure in the present case was the result of a local regulation which authorized the provost marshal to conduct random inspections of vehicles entering the base for the purpose of preventing the illegal introduction of contraband or unauthorized persons into the military installation. A military policeman, apparently acting pursuant to this base regulation, selected the particular vehicles to be stopped on the basis of his own procedure for determining randomness.

Such a seizure of persons at the gate of a military base within the United States is fundamentally dissimilar to the one in *United States v. Rivera,* 4 M.J. 215 (C.M.A.1978), due to its situs in our own country. But *see United States v. Crowley,* 9 F.2d 927 (N.D. Ga.1922). Nevertheless, I agree with Judge Perry that this military base commander had a distinct constitutional authority to establish reasonable gate inspection procedures as a necessary prerequisite to his responsibility, imposed by service-wide regulations approved by the President, to protect the order, security and discipline of the base. *Cafeteria and Restaurant Workers Union v. McElroy,* 367 U.S. 886, 890, 81 S.Ct. 1743, 6 L.Ed.2d 1230 (1961). Yet, with Judge Perry I find the procedural practice or technique for the inspection of vehicles at the gate of this base to constitute for law enforcement officials a "de facto" general warrant for search for evidence of crimes.

Such a misemployment of the inspection power in the present case by the base commander is per se unreasonable and constitutionally defective in that it fails to entail an effective program to ensure proper control of the intrusion into constitutional protections still viable for the service member. *See United States v. Burrow,* 396 F.Supp. 890, 901 (D.Md.1975). Moreover, in the sense of the aforementioned constitutional justification of this power of the commander, I also find impropriety. The degree of delegation to law enforcement officials of this authority to inspect created by base regulations and practice is so impermissibly broad in the present case as to illegally abrogate the regulatory responsibility of the commander to protect the base. E. g. *See v. City of Seattle,* 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 319 (1967); *Camara v. Municipal Court,* 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

In addition, this delegation unjustifiedly transfers this duty and power to lesser officials who are primarily concerned with incompatible law enforcement responsibilities. In my view, this renders constitutionally suspect the exercise of this power with respect to the different public interests at stake. *See United States v. Burrow, supra* at 900, 901.

COOK, Judge (dissenting):

With obvious exceptions, such as the Justices and the staff of the Court and the Solicitor General of the United States, no one can enter the United States Supreme Court building without first submitting to an electronic inspection of his person and handcarried effects. Inspection of handcarried articles is also standard procedure in almost every other public building at the seat of the government, from the Archives to the White House.

Would that it were otherwise, but events of the day demand safeguards for government people, government functions, and government buildings. To my knowledge, no one has denied the government's right to protect its officers and employees, its functions, and its property. I am certain that none of the inspection systems guarding the United States Supreme Court, the White House, and the Capitol can be condemned as "unreasonable" intrusions upon a particular individual and his private effects, within the meaning of the Fourth Amendment, because the intrusion into person and package is unsupported by probable cause or even an articulable suspicion that he may be attempting to introduce articles of a dangerous nature or for a criminal purpose. I am equally certain that an individual and his privately-owned vehicle seeking to obtain entry onto a military base can be subjected to inspection at the gate for the same reasons as have led to the civilian inspections and, as in those situations, without need of probable cause or articulable suspicion that a particular vehicle is a source of danger. In fact, perhaps greater reason exists for such action in respect to a military base than in regard to civilian areas.

Aside from terrorism or other disorders, the armed forces, as well as the nation in general, face a serious drug abuse situation. *United States v. Alef*, 3 M.J. 414, 418 n. 13 (C.M.A.1977). Our cases reveal that the introduction of contraband drugs into military bases is epidemic. What can military authorities do to counter these threats to its ability to function as a disciplined force? In the civilian community, the customs officer can constitutionally search an incoming individual and his effects for contraband and duty items, without regard to probable cause or suspicion of wrongdoing. *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *see also United States v. 12 200-Ft. Reels of Film*, 413 U.S. 123, 125–6, 93 S.Ct. 2665, 37 L.Ed.2d 500 (1973). In my view, the military community has similar authority as regards persons entering its territory. Of course, the form of search must "be as 'carefully limited in time, place and scope' as the purpose of the" search requires and its effectiveness necessitates. *United States v. Unrue*, 22 U.S.C.M.A. 466, 470, 47 C.M.R. 556, 560 (1973).

At trial, the accused contended, as he does here, only that the decision to stop the car in which he was a passenger was illegal. The alleged illegality was not that the stop was made on a random basis, as the enabling regulation provides, but was predicated upon the personal prejudices of Sergeant Paschall, the senior of the two guards at the gate. *See United States v. Chase*, 1 M.J. 275 (C.M.A.1976). Sergeant Paschall's purported prejudices were that he searched only vehicles registered to enlisted persons and that he "liked to stop negroes."

Assuming that neither a vehicle nor a person seeking entrance to a military base can be stopped for inquiry or search upon the basis of a suspect classification, such as race (*but compare United States v. Martinez-Fuerte*, 428 U.S. 543, 563, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976)), the record contains ample evidence to support the trial judge's determination that Sergeant Paschall's decision to stop the accused's vehicle was not dictated or influenced by a suspect

classification. Moreover, utilization of a dog trained to detect contraband substances as a means of effectuating the purpose of the vehicle stop is, in my judgment, lawful. *See* my opinion in *United States v. Thomas*, 1 M.J. 397 (C.M.A.1976). So, too, is it lawful, as part of the inquiry into, and possible search of the vehicle, to require the occupants to dismount. To this point, therefore, all of Sergeant Paschall's actions in respect to the vehicle and the accused were, in my opinion, consonant with the Fourth Amendment.

In fact, the accused was not subjected to a search. When he had left the car, he was seen to discard some articles. As the stopping of the car and the direction to accused to dismount were lawful, they imparted no illegality to the accused's act. *Compare United States v. Chamblis*, 425 F.Supp. 1330 (E.D.Mich.1977). Considered separately, the guard's recovery of the articles discarded by accused was indisputably legal and those articles were admissible into evidence at trial. *United States v. Wilson*, 492 F.2d 1160 (5th Cir. 1974), *cert. denied* 419 U.S. 858, 95 S.Ct. 106, 42 L.Ed.2d 92 (1974).

I would affirm the decision of the Court of Military Review.