UNITED STATES

v.

Nathaniel JOHNSON, 246 15 2996, Corporal (E–4), U. S. Marine Corps.

NCM 78 0158.

U. S. Navy Court of Military Review.

Sentence Adjudged 23 Aug. 1977.

Decided 31 July 1978.

CAPT G. M. Potter, USMC, Appellate Defense Counsel.

MAJ D. A. Higley, USMC, Appellate Government Counsel.

Before CEDARBURG, C. J., and ROOT and GREGORY, JJ.

PER CURIAM:

Appellant was convicted below, by the military judge, of one charge and specification of possession of marijuana in violation of Article 92 of the Uniform Code of Military Justice, 10 U.S.C. § 892. At the Marine Corps Recruit Depot, Parris Island, South Carolina, on April 15, 1977, Corporal Johnson was a passenger in a vehicle owned and operated by a fellow Marine preparing to leave the base on liberty. While proceeding out the road leading to the main

gate, his driver was ordered to a search location just off the road on Horse Island. The main gate is approximately one mile from Horse Island and is reached by traveling a two-lane road which is closely bordered by marshland along the entire one-mile distance.

Upon arrival at the search location, the driver, Corporal BONE, and appellant were told by a military policeman that the vehicle was to be searched pursuant to a Depot Order. He ordered them to debark and open all doors and the trunk. The marijuana was found in a metal box under appellant's seat, and he was arrested. The Government does not rely on probable cause or consent, express or implied.

Appellant alleges error as follows:

I

THE MILITARY JUDGE ERRED WHEN HE ADMITTED THE MARIJUANA INTO EVIDENCE WHICH WAS THE PRODUCT OF AN ILLEGAL SEARCH.

II

THE GOVERNMENT FAILED TO PROVE THE ELEMENTS OF THE OFFENSE BEYOND A REASONABLE DOUBT.

III

THE MILITARY JUDGE ERRED TO THE PREJUDICE OF THE APPELLANT WHEN HE ACCEPTED INTO EVIDENCE AND CONSIDERED PROSECUTION EXHIBIT 8 WHICH REFLECTED THAT THE APPELLANT HAD RECEIVED A NONJUDICIAL PUNISHMENT BUT FAILED TO REFLECT WHETHER THE APPELLANT HAD BEEN AFFORDED AN OPPORTUNITY TO CONSULT WITH A LAWYER PRIOR TO ACCEPTING THE NONJUDICIAL PUNISHMENT. *See* United States v. Booker, 5 M.J. 238 (C.M. A.1977).

A full examination of the record of trial and the authorities leads us to the conclu-sion that the findings below were correct. We affirm.

We will speak to the Assignments of Error in reverse order.

■ Assignment III complains of a failure of the military judge to comply with the holding in *United States v. Booker,* 5 M.J. 238 (C.M.A.1977). *Booker* is not to be applied retroactively to cases tried or re-tried before the date of publication of the *Booker* opinion, October 11, 1977. *United States v. Cannon,* 5 M.J. 198 (C.M.A.1978). The assignment is without merit as the case at hand was tried in August, 1977.

■ Assignment II alleges the evidence was insufficient to prove Johnson's guilt beyond a reasonable doubt. There is no question that the evidence on the elements of the crime was directly in conflict. The driver of the vehicle quoted Johnson as stating, as they were ordered to the search point: "Don't drive in there . . . we're busted." Another witness identified the metal box (later found to contain marijuana) as being in appellant's hands shortly before appellant got in the car. Johnson denied the statements and any knowledge of the box or marijuana. Fingerprint tests of the box and its contents failed to disclose any prints traceable to Johnson or his driver.

While this Court may judge the credibility of witnesses, we must also recognize the fact "that the trial court saw and heard the witnesses." Article 66(c), Uniform Code of Military Justice. We give great weight to the determination of the finder of fact at trial, the military judge, and conclude there is no reason to disturb his findings.

Assignment I alleges an illegal search and seizure violative of Johnson's rights under the Fourth Amendment to the Constitution of the United States. Within this assignment, appellant raises a number of objections to the search procedure:

1. *It was not a "gate" search but conducted one mile from the main gate.*

■ The road from Horse Island to the main gate is flanked by marshland. It is,

for practical purposes, nothing more than a causeway. There is no location closer to the gate where a search point could be located without severely interfering with both inbound and outbound traffic. From the testimony of the Depot Provost Marshal, Major Ayres, and a view of the map in evidence, it is apparent that a parking area next to the main gate is grossly inadequate for the purpose of a random search and would unnecessarily interfere with legitimate traffic.

Horse Island was designated as a search location by the Depot Commander in Depot Order 5510, the Military Police Standard Operating Procedure. As a geographic necessity, it is the only practical location that could be selected.

   2. *The record is silent as to whether Parris Island is a "closed" or "open" base.*

■ Appellate defense counsel alleges Parris Island is not a "closed base." This must come as a surprise to the hundreds of thousands of Marines who experienced "boot camp" there. It is virtually impossible to depart without authority. He further states: "Parris Island is not a tactical base with tactical weapons." While it may not be a tactical base, thousands of recruits are trained in the use of small arms each year. There are five rifle ranges and one hand grenade range shown on the map. Appellant himself had been a rifle coach and a range tower operator. The standard rifle used by Marines is commonly known as the "M–16." It is capable of a high rate of automatic fire. It is a tactical weapon whose unauthorized acquisition must be guarded against. The depot is located on an island. Traffic in and out is controlled at the main gate where visitors' passes are issued. From common military knowledge, an examination of the map and the testimony of the Provost Marshal, we find the

Marine Corps Recruit Depot, Parris Island, South Carolina, to be a "closed" base.

   3. *There were no warning signs posted for outbound traffic or publication of notice of the date, time and place of the proposed search.*

Corporal Bone, appellant's host driver, knew the check point was in operation, having seen it at 1530 the same day. He said, ". . . I knew my vehicle was subject to a search while I have it registered at Parris Island."

■ If appellant is correct in his view that the date, time and place of gate searches must be announced ahead of time, the deterrent effect would be lowered to zero. Someone wishing to transport stolen Government property or contraband off the base would merely have to time his departure before 1500 or after 1700, that being the time period scheduled on the date in question. If this be the law, the smuggler would then know he is absolutely safe at all times outside of those published. Clearly, this cannot be a valid condition of random gate searches. As Mr. Justice White said in *United States v. Biswell*, 406 U.S. 311 at 316, 92 S.Ct. 1593 at 1596, 32 L.Ed.2d 87 at 92 (1972):

   ". . . Here, if the inspection is to be effective and serve as a credible deterrent, *unannounced*, even frequent, inspections are essential. . . ." [emphasis added].

While *Biswell* involved unannounced inspections of a licensed gun shop, this principle is applicable to the random gate search as well.

■ Did appellant have knowledge, actual or constructive, that as a passenger in a vehicle, his effects therein might be subject to a random gate search?

The Commanding General in Depot Order P5000.7a, paragraph 904,[1] set forth his poli-

1. VOLUME II—ADMINISTRATION, MANAGEMENT MANUAL 904.1

904. *SEARCHES AND SECURITY INSPECTIONS*

1. *Security Inspections.* In the interest of safeguarding military information, public prop-

erty against loss or theft, and avoiding traffic in contraband:

   a. *Removal of Government Property.* The removal from this depot of property owned or possessed by the United States, except as authorized in accordance with paragraph 905 below, is prohibited.

cy concerning Security Inspections. Paragraph 904.1.d(1), referring to vehicles owned or operated by military personnel, states:

"The privilege of operating a motor vehicle aboard this depot is extended to military personnel, subject to the right of military authorities to conduct security inspections of vehicles and *effects therein* for the purpose of recovering articles of Government property and preventing unlawful possession of contraband . . ." [Emphasis added].

Appellant had been through recruit training at Parris Island from November 1974 to

b. *Contraband.* The term "contraband", as used in this manual, is defined as any item or substance the mere possession of which is rendered illegal by federal or state law, or military regulations.

\* \* \* \* \* \*

d. *Security Inspections of Vehicles Owned or Operated by Military Personnel*

(1) The privilege of operating a motor vehicle aboard this depot is extended to military personnel, subject to the right of military authorities to conduct security inspections of vehicles and effects therein for the purpose of recovering articles of Government property and preventing unlawful possession of contraband. Such inspections may involve the use of marijuana dogs and/or other detection devices.

(2) Prior to conducting a security inspection of a vehicle operated by or in the possession of military personnel, the inspector shall courteously explain the purpose of the inspection and solicit cooperation. In the event of resistance, the inspector shall advise the person in possession of the vehicle that these inspections are conducted under the authority of the Commanding General and resistance is unlawful. If the individual fails to peaceably submit, he shall be placed under military apprehension and the inspection conducted. A complete report of the incident shall be forwarded to his commanding officer within 24 hours.

904.2 VOLUME II—ADMINISTRATION, MANAGEMENT MANUAL

2. *Searchers*

a. Vehicles owned by the U.S. Government are subject to search at anytime.

b. In addition to those officers authorized by law to order and conduct searches, the Chief of Staff, Staff Duty Officer and Depot Officer of the Day, upon probable cause, are authorized to order searches of military personnel and property within the geographical area of their respective jurisdictions.

c. Personnel assigned to the Military Police Company, while in a duty status, are authorized to conduct a search of any object, vehicle, or

February 1975. He returned to be a member of the command on July 18, 1976, and remained a member up to the date of the offense, April 15, 1977—a period of some nine months.

Depot Order P5000.7a is a General Order. Paragraph 171a, *Manual for Courts-Martial, United States, 1969* (Revised edition). Appellant as a member of the command, is charged with knowledge of its contents.

4. *There was no valid reason for the search; no evidence of thefts.*

5. *Although the Commanding General delegated authority to his Assistant*

place within this depot belonging to or operated by any person at any time without a warrant when:

(1) The owner or operator consents; or

(2) The search is incident to a lawful apprehension or;

(3) The search is under circumstances demanding immediate action to prevent the removal or disposal of property believed on reasonable grounds to be criminal goods; or

(4) Authorized by the Chief of Staff, Staff Duty Officer or the Officer of the Day.

d. Except under unusual circumstances, the officers herein empowered to authorize searches will not authorize a search within an area under the control of regimental or battalion commanders without the approval of such commander. Failure to secure such approval, however, will not invalidate any search made pursuant to this authority which is otherwise lawful.

e. Paragraph 152, Manual for Courts-Martial, describes the elements of lawful search.

f. The Provost Marshal and his representatives are authorized to enter any area within the jurisdiction of this depot for the purpose of protecting life or property where a clear and present danger exists, to quell an existing breach of the peace, or to effect a lawful apprehension.

g. Authority to order random gate searches and inspections is delegated to the Assistant Chief of Staff, G–2/G–3, subject to the following limitations:

(1) The provisions of paragraph 904.1 apply.

(2) The Assistant Chief of Staff, G–2/G–3 shall not delegate this authority to any other person.

(3) An order to conduct a gate search or inspection shall be in writing directed to the Depot Provost Marshal and specify the date and time of the inspection/search.

(4) In order to constitute a legal search and comply with legal precedent it is necessary that vehicles be searched on a random basis without exemption.

*Chief of Staff [Colonel O'Rourke] G–2/G–3 to decide when, where and how random gate searches were to be conducted no such independent decision was made by Colonel O'Rourke on this occasion.*

■ These issues are related and will be considered together.

As Judge Perry stated so succinctly in *United States v. Harris,* 5 M.J. 44, 65 (C.M. A.1978):

. . . we are convinced that use of gate searches to deter persons from introducing contraband onto a military installation is an eminently reasonable response to a serious problem affecting the military . . . [Cites omitted].

The Commanding General of Marine Corps Recruit Depot, Parris Island, is charged with the duty to "safeguard the Government's own property." *United States v. Chase,* 1 M.J. 275, 279 (C.M.A.1976). *See* United States Navy Regulations 1973, Articles 0702, 0727, 0731, 0736.

The Depot Provost Marshal presented Colonel O'Rourke with a written request for a gate search.[2] Within that request, he said: ". . . thefts of govt (sic) property (especially MCX) have been on the increase. We could stand to give the thieves something to think about."

Surely if it is "eminently reasonable" to use a gate search to deter incoming contraband, it is equally reasonable to use a gate search to deter outgoing contraband and stolen Government property.

Appellate Defense Counsel cites the following part of the Provost Marshal's testimony (R. 18) to support issue 4 above:

Q. Major AYRES, had there been a specific theft of government property that day that you knew of?

A. No.

Q. In other words the day of 1 April 1977 when you requested this search?

A. No, obviously not. The search was requested for the 15th of April, two weeks later so that wouldn't make sense to request a search that late.

Q. So, in all actuality it's highly possible that there had been no thefts at all and no contraband taken?

A. Yes. We had no way of knowing, but basically this is the same thing as a health and welfare inspection conducted by a Company Commander, which he does at random times and dates to insure the health and welfare, and well being of his command. That's in fact what I'm doing for the Commanding General.

Clearly, the witness was referring to April 1, 1977, not to a general and extended time frame, when he said it was highly possible there had been no thefts. His recital of an increase in theft of Government property stands as uncontradicted evidence and fully supports the decision to order a gate search of outbound vehicles.

Although the Provost Marshal did not state there was a "rash" or "epidemic" of theft of Government property, he did say

---

2. DEPARTMENT OF THE NAVY
MEMORANDUM     DATE: 1 APR 77
FROM: PROVOST MARSHAL
TO: A C/S, G–2/G–3
SUBJ: VEHICLE SEARCH FOR GOV'T PROPERTY & CONTRABAND (OUTBOUND)
1. IT IS REQUESTED THAT AUTHORIZATION BE GRANTED TO CONDUCT SUBJECT SEARCH ON 15 APR 1977 FROM 1500 TO 1700.
2. THE PURPOSE OF THE SEARCH IS TO PREVENT THEFT OF GOVERNMENT PROPERTY BY ACTUAL DETECTION AND TO DETER THEFT THROUGH THE USE OF RANDOM SEARCHES.
3. HORSE ISLAND WOULD BE USED. THE FIRST 5 OUTBOUND VEHICLES TO REACH THE TCP WOULD BE DIRECTED INTO THE SEARCH AREA. WHEN THE FIRST VEHICLE IS RELEASED THE VERY NEXT VEHICLE TO REACH THE TCP WOULD BE DIRECTED INTO THE SEARCH AREA. THIS WILL ALLOW FOR AN EFFICIENT OPERATION AND WILL ALSO PRECLUDE ANY BACK–UP OF VEHICLES. MAJ. CROW, THE DEPUTY SJA, CONFIRMS THAT SUCH A SEARCH WOULD BE RANDOM & SATISFIES ALL LEGAL REQUIREMENTS.
4. WE HAVE NOT HAD SUCH A SEARCH IN A LONG TIME, BUT THEFTS OF GOVT PROPERTY (ESPECIALLY MCX) HAVE BEEN ON THE INCREASE. WE COULD STAND TO GIVE THE THIEVES SOMETHING TO THINK ABOUT.

**686**

there was an "increase." We do not view as a requirement for a commander's corrective action the existence of a "rash" or "epidemic" of incidents, which smacks of semantic calculus. Any increase of incidents of stolen property is valid enough reason to order a search.

Johnson claims that Colonel O'Rourke merely "rubber stamped" Major Ayres' request for a gate search and made no independent decision concerning the methodology or timing of the search. The request was given Colonel O'Rourke on April 1. He dated, "ok'd" and initialed it on April 4, after first conferring with the Depot Chief of Staff.

If there is any presumption here, it is that Colonel O'Rourke made a mature, independent decision in adopting the suggested date, time and place. The place had already been approved by the Commanding General in Depot Order P5510, the standard operating procedure for the Military Police. Much of the methodology also had been previously established. Merely because the date and time was suggested by a subordinate in no way makes Colonel O'Rourke's decision a "rubber-stamp." When a commander or his designee adopts a course of action suggested by a subordinate, it is his course of action from that moment on, not that of his subordinate.

*United States v. Harris, supra,* at 65, further holds:

> . . . To insure the least possible intrusion into the constitutionally protected area, and thereby preserve freedom from unreasonable invasions of personal privacy, a procedure must be employed which completely removes the exercise of discretion from persons engaged in law enforcement activities. This contemplates a completely independent determination of times when the searches will be conducted, the method of selecting the vehicles to be stopped, the location of the operation, and the procedure to be followed in the event something is discovered. [Footnotes omitted].

After balancing all of the factors discussed in *Harris*, we find the use of a gate search in this case was a reasonable invasion of Johnson's right of privacy.

It is stipulated that this was a purely random gate search. We find that the criteria of *Harris* are met here. A very careful regulatory scheme had been established. There was no reliance on a gate guard's opinion of his marijuana dog's motivation to determine what car to search, as was the case in *Harris*.

This search was carefully conducted and was a fair and reasonable intrusion into appellant's Fourth Amendment rights.

Accordingly, the findings of this court-martial, and the sentence as modified by the convening and supervisory authorities are proper and affirmed.